# EXHIBIT 2

September 10, 2015



**ANDERSON ECONOMIC GROUP**

# Declaration on Damages to Consumers in Beck's Country of Origin Matter

Patrick L. Anderson, Principal

**Anderson Economic Group LLC**

In the matter of

Francisco Rene Marty, Seth Goldman, and
Fernando Marquet
on behalf of themselves and all others similarly situated,
Plaintiffs,

vs.

Anheuser-Busch Companies, LLC,
Defendants

United States District Court
Southern District of Florida

Case No. 13-cv-23656-JAL

*This report contains confidential information and copyrighted material that may not be disclosed except pursuant to the terms of the Protective Order in this matter and federal copyright law.*

Copy Number: _____

**Table of Contents**

*I. Declaration of Patrick L. Anderson* ...................... *1*

Introduction .................................................. 1

Background and Credentials ................................ 1

*Experience* ................................................ *1*

*Publications* ............................................. *2*

*II. Questions Answered in June 26, 2014 Report* ..... *4*

Methodology .......................................... 5

Summary of Findings in June 2015 report ........................... 6

*III. Damages Analysis for Settlement Agreement* .... *11*

Settlement Terms ............................................. 11

Maximum Potential Recovery ........................... 11

Assumptions: Settlement Parameters .................................. 12

Table 1. Refund Per Unit in Proposed Settlement Agreement .................................................. 12

Table 2. Cap on Household Refunds Per Year .............. 12

*Potential Recovery: Demographic Method* ..................... *12*

Table 3. Potential Recovery: Demographic Method ...... 14

*Potential Recovery: Sales Volume Method* ..................... *15*

Table 4. Potential Recovery: Sales Volume Method ...... 17

*Comparison: Demographic Method vs. Sales Volume Method* ......................................... *18*

Table 5. Summary: Demographic Method and Sales Volume Method .............................. 19

Declaration ....................................................... 20

Conclusion ..................................................... 22

*IV. Appendix of Exhibits* ........................................ *23*

Exhibit 1. *Curriculum Vitaes*                                Tab 1

Exhibit 2. Representative Clients of Anderson Economic Group                                Tab 2

Exhibit 3. Statement of Ethical Principle and Tenets of Practice                                Tab 3

Exhibit 4. Industry Data                                Tab 4

4.1 Industry Brief: The Economic Structure of the

© 2015, Anderson Economic Group, LLC

Table of Contents

U.S. Alcoholic Beverage Industry

4.2 Countries, Tastes, and the Value of Beer
   Franchises in the United States (Abstract)

4.3 Alcoholic Beverage Consumption by
   Major Category, U.S., 2007-2012

4.4 Consumption of Beer by Category,
   U.S., 2007-2012

4.5 Consumption of Leading Imported Brands,
   U.S., 2007-2012

Exhibit 5.  ABI Sales Data                              Tab 5

Exhibit 6.  Extract of Tentative Settlement Agreement  Tab 6

Exhibit 7.  Potential Recovery: Demographic Method     Tab 7

7.1 Potential Recovery: Demographic Method

Exhibit 8.  Potential Recovery: Sales Volume Method    Tab 8

8.1 Potential Recovery: Sales Volume Method

8.2 Sales Volume Method: Conversion
   from Barrels to Case Equivalent Volume
   of Beck's Sold, 3-year Period

8.3 Sales Volume Method: Conversion from Volume
   of Beck's Sold to Rebate Amount, 2012

8.4 Sales Volume Method: Conversion from
   Volume of Beck's Sold to Rebate Amount, 2013

8.5 Sales Volume Method: Conversion from Volume
   of Beck's Sold to Rebate Amount, 2014

8.6 Reconciliation of Volume Information

Exhibit 9.  Distribution of Alcoholic Beverage
   Consumption                                         Tab 9

Exhibit 10.  List of Data and Documents Reviewed       Tab 10

© 2015, Anderson Economic Group, LLC

# I.  Declaration of Patrick L. Anderson

**INTRODUCTION**

1. I am Patrick L. Anderson, the author of this declaration, and the report listed below. I am a professional economist and a principal in the consulting firm of Anderson Economic Group, LLC ("Anderson Economic Group").

2. My background and credentials are summarized below, in the section "Background and Credentials" on page 1, and "Publications" on page 2.

   I include an extensive *Curriculum Vitae* in Exhibit 1, "Curriculum Vitaes," in the Appendix.

3. Our firm was retained by the attorneys of Harke Clasby & Bushman LLP and Kozyak Tropin & Throckmorton, P.A.to prepare this declaration, and the preceding reports.

4. The conditions of our engagement were summarized on June 26, 2014 in my expert report, "Expert Report: Damages Issues for Class Certification." In that report I also noted the principles of ethical conduct I followed in this engagement, including the avoidance of bias, disclosure of methods and sources, and non-acceptance of any contingency fee arrangement. These conditions of engagement have not changed during our work on the report and declaration.

5. I was assisted in this work by other staff of our firm. In particular, I was assisted by Ilhan K. Geckil, Senior Economist. Mr. Geckil has been my colleague on a number of financial valuation or damages assessment involving franchised companies in multiple states, including Alaska, California, Illinois, Michigan, Montana, Nevada, New York, Ohio, Texas, and Washington.

6. I supervised and reviewed the work of Mr. Geckil, and other staff within our firm that assisted in the production of this report.

**BACKGROUND AND CREDENTIALS**

### EXPERIENCE

7. As I previously described in my June 26, 2014 report, my experience and credentials in the relevant areas of business economics are extensive. This experience has been gained through a combination of academic training and professional experience.

8. My academic background includes a Bachelor's degree in Political Science and a Master's degree in Public Policy with concentration in Economics, both from the University of Michigan in Ann Arbor. I have also completed specialized training in business economics, statistics, survey research, and related fields at Carnegie-Mellon University and the Harvard School of Public Health.

9. My professional background includes over 20 years experience as a professional economist or state government executive. Before founding

Anderson Economic Group, I held economist positions at Manufacturers National Bank of Detroit (now Comerica) and Alexander Hamilton Life Insurance Company. I also held positions as Deputy Budget Director for the State of Michigan, and Chief of Staff for the Michigan Department of State.

10. Since founding Anderson Economic Group in 1996, I have directed the business economics consulting practice.

11. The clients of my consulting practice have included clients from all three major sectors of our economy (government, non-profit and private), including:

   a. State and local governments (including the states of Michigan, Kentucky, North Carolina, Ohio, and Wisconsin, and the province of Ontario, Canada); the cities of Detroit, Michigan, Norfolk, Virginia, Cincinnati, Ohio, and Fort Wayne, Indiana; and the counties of Oakland in Michigan and Collier in Florida);

   b. Nonprofit organizations (including the American Association of Automobile Manufacturers, Business Leaders for Michigan, the Michigan Chamber of Commerce, the Michigan Manufacturers Association, the Michigan Retailers Association, Wayne State University, Michigan State University, and the University of Michigan); and

   c. Private firms (including General Motors Corporation, Ford Motor Company, Delphi, Alaska Rent-A-Car, SBC Ameritech, Kmart, Meijer, The Detroit Lions, Innkeepers USA, InBev USA, Beck's North America, Labatt USA, Heineken USA, Diageo North America, Automobile dealers representing General Motors, Ford, Chrysler, and other brands), and alcohol beverage wholesalers representing Anheuser-Busch, Miller, Molson, Labatt, Beck's, Heineken, Mondavi and other brands).

For a representative list of Anderson Economic Group clients, please see "Representative Clients of Anderson Economic Group" on page 23.

## PUBLICATIONS

12. I am the author of over 100 published articles and monographs on topics covering a range of economics, finance, and public policy topics. These include publications of the following types:

   • The book *The Economics of Business Valuation*, which was published by Stanford University Press in 2012.

   • The book *Business Economics and Finance,* which was published by CRC Press in 2004.

   • The chapter "New Developments in Business Valuation," in the book *Developments in Litigation Economics* published December 2005 by Elsevier Press.

   • The book *Applied Game Theory and Strategic Behavior*, which was published by CRC Press in July 2009. Mr. Geckil is the co-author of this book.

   • The paper "Policy Cost Uncertainty and Persistent Unemployment" which won the 2013 Edmund A. Mennis Award for best contributed paper to the

journal *Business Economics* from National Association for Business Economics (NABE).

- The paper "The Value of Private Businesses in the United States" which won the 2009 award for outstanding writing from NABE.

- The paper "Pocketbook Issues and The Presidency," which won the 2004 Edmund A. Mennis prize for the best contributed paper from NABE. Senior Economist Ilhan K. Geckil is the co-author of this paper.

- Proceedings of conferences, and working papers, including papers authored or co-authored by me presented at conferences sponsored by the National Association of Forensic Economists and the Southern Economics Association.

- Short articles published in periodicals such as *The Wall Street Journal*.

- Lengthy monographs published by think tanks such as the Heartland Institute of Chicago, Illinois.

- Articles in trade publications, such as *Property Tax Advisor* and *Investment Watch*.

Many of these works include empirical or theoretical discussions of factors that are relevant in this case. These include:

- The paper "Diminished Value, Lost Profits, and Other Measures of Commercial Damages," presented at the Southern Economics Association conference in Washington DC in November 2005. Ilhan Geckil is the co-author of this report.

- The paper "Damages and Valuation of Franchised Businesses," presented at the ASSA conference in San Diego in January 2004.

- The paper "Countries, Tastes, and the Value of Beer Franchises in the United States," presented at the International NAFE conference in Scotland in 2001. Ilhan K. Geckil is the co-author of this paper.

- The paper "Dynamic Programming Methods for the Estimation of Commercial Damages," presented at the ASSA conference in San Francisco in January 2008.

- My 2004 book *Business Economics and Finance,* and in particular the two chapters on the economics of the firm, and valuation and damages.

- The chapter I authored on proper methodology and important case law on valuation and damages, in the 2005 book *Litigation Economics*.

13. My academic and professional background, as well as a list of publications and a list of cases in which I have prepared an expert report, are included as a part of the Appendix to this report. See Exhibit 1, "Curriculum Vitaes," in the Appendix.

## II.  Questions Answered in June 26, 2014 Report

14. I identified a short set of questions in this matter that are within my area of professional expertise, and which may be helpful to the Court in adjudicating the matter.

*Question 1: What is the structure of the market for consumer purchases of beer in the United States, in terms of:*
*(a) The organization of the industry that supplies, distributes, and retails the product; and*
*(b) The segmentation of the products that consumers purchase?*

*Question 2: Within the existing market and industry structure, what price would consumers typically pay for the following products:*
*(a) Imported European lager beers, such as German-originated St. Pauli Girl and Dutch-originated Heineken; and*
*(b) American lager beers such as Budweiser, Miller, and Coors?*

*Question 3: Assuming that consumers were confused about the origin of Beck's beer beginning in the year 2012, can we outline a methodology and a set of data that would enable us to estimate the following:*
*(a) The likely price differential between a hypothetical German-originated Beck's and the actual American-originated Beck's;*
*(b) The volume of Beck's beer that was purchased, the total consumer expenditures on these products, and the price differential embedded in these expenditures; and*
*(c) The volume, expenditures, and price differentials in the states of California, Florida, and New York, as well as the United States as a whole?*

*Question 4: For those consumers who were confused beginning in 2012 about the origin of Beck's in the United States:*
*(a) Is the number of such consumers large, and is the nature of their damages common among their large number?*
*(b) Is the price differential a reasonable estimate of the damages they suffered?*

*Question 5: Using the data and methodology stated above, can we:*
*(a) calculate damages for consumers in the United States;*
*(b) calculate them separately for consumers in the states of Florida, California, and New York; and*
*(c) calculate damages for individuals, such as plaintiff class members?*

*Question 6: Did Anheuser-Busch Inbev have a financial incentive to change the production of Beck's beer from Germany to the United States, and would it be possible to estimate the gains available to them from pursuing that incentive?*

15. Certain issues are not addressed in the June 26, 2014 report. These include:

   A. We were not engaged to, and do not conclude whether, as a matter of law consumers in the United States have been sufficiently confused about the origin of Beck's beer to warrant relief under the state and federal statutes identified in the complaint.

   B. We assume that both imported Beck's and domestically-produced Beck's did comply, and do now comply, with relevant state and federal laws regarding health and safety of food products, as well as labeling requirements regarding alcohol content. We were not engaged to, nor do we conclude, whether German beers in general, or Beck's beer produced in Germany, provide any intrinsic health or safety benefits compared with the comparable product brewed in the United States.

**METHODOLOGY**

16. In our review for the expert report dated June 26, 2014, we undertook the following tasks:

   a. Reviewed the facts of the controversy at hand. This review was focused on the specific questions presented to us as economics experts, and not on other legal questions raised in the case. We created a chronology of events.

   • See "Facts in this Controversy" on page 5 of the June 26, 2014 report.

   b. Identified specific questions within my expertise, and identified explicit assumptions necessary to complete our analysis.

   • See "Questions Answered in June 26, 2014 Report" on page 4.

   c. Reviewed the deposition transcripts and deposition exhibits of certain individuals.

   • See, e.g., Exhibit D-4."Selected Pages from Deposition of Justin Ashby" in Appendix D, and Exhibit D-7."Selected Pages from Exhibit 59 from deposition of Elizabeth Price Lee (Project Schnitzel)" in Appendix D of the June 26, 2014 report.

   d. Reviewed the structure of the alcoholic beverages industry.

   • See Exhibit B-1, "Industry Brief: "The Economic Structure of the U.S. Alcoholic Beverage Industry" by Patrick L. Anderson," in Appendix B of the June 26, 2014 report.

   e. Analyzed the market for beer products, and relevant trends in product, pricing, and sales.

   • See "Industry Analysis" on page 11 of the June 26, 2014 report.

   f. Reviewed the market conditions of the relevant market areas.

   • See "Review of the Subject Market Areas" on page 14 of the June 26, 2014 report.

   g. Selected the best methodology for answering the specific questions.

   • See, along with the other sections cited, the discussions under "Methodology" on page 10, and "Consumer Damages" on page 16 of the June 26, 2014 report.

   h. Prepared a set of schedules, data tables, and other exhibits demonstrating our analysis and work on this case.

   • See "Appendix of Exhibits" of the June 26, 2014 report.

i.  Summarized the results in a narrative, and also created in writing substantial additional references to data, sources, and methodology.

J.  See "Conclusion" on page 22 and the "Appendix of Exhibits" of the June 26, 2014 report.

**SUMMARY OF FINDINGS IN JUNE 2014 REPORT**

*Question 1:  "What is the structure of the market for consumer purchases of beer in the United States, in terms of: (a) The organization of the industry that supplies, distributes, and retails the product; and (b) The segmentation of the products that consumers purchase?"*

*Finding.* The industry that supplies, distributes, and retails alcoholic beverages in the United States is structured into a "three tier system," which separates the producers of the product from those that distribute it, and the distributors from those that retail it to consumers. The three tier system originated in post-prohibition concerns about "tied house" arrangements that forced taverns and other retailers to sell only certain brands, as well as the goals of temperance and tax collection. Under the 21st amendment to the United States Constitution, states are allowed to regulate the sale and importation of alcoholic beverages within their borders, and a similar, though not identical, three-tier system has been erected in each of the 50 states.

The three tier system is similar to the franchise system that is dominant in many other industries, such as automobiles, hotels, and fast-food restaurants. In these industries, it is the supplier that creates the brand and supports the brand image of the product, often through extensive advertising. Retailers rely upon these brand images to guide consumers to the products they choose.

The beer market itself is generally segmented into domestic, imported, and "craft" beer categories, with further segmentation in each main category. Over the past two decades, the domestic beer category has been losing market share to imported and craft products, although domestic beer remains the largest by volume. Craft beers remain fragmented and represent the smallest volume of the three main categories.

•  See "Industry Analysis" on page 11[of the June 2014 report]; "Beer Consumption Trends in the U.S." on page 12; and "Selected Brands Performance in the U.S." on page 13 of the June 26, 2014 report.

•  See also Exhibit B-1, "Industry Brief: "The Economic Structure of the U.S. Alcoholic Beverage Industry" by Patrick L. Anderson," in Appendix B of the June 26, 2014 report.

*Question 2:  "Within the existing market and industry structure, what price would consumers typically pay for the following products: (a) Imported European lager beers, such as German-originated St. Pauli Girl and*

*Dutch-originated Heineken; and (b) American lager beers such as Budweiser, Miller, and Coors?"*

*Finding.* Within the general beer segments, consumers tend to pay the lowest prices for domestic products, higher prices for imported products (especially European beers), and a range of very high and relatively high prices for the widely differentiated craft beers.

Within the largest volume category, domestic beer, prices for specific segments run from low-cost "popular price" brands (such as Old Milwaukee) to premium price brands (such as Budweiser). Within the import category, European beers (such as German beers like Beck's and St. Pauli Girl, Belgian beers such as Stella Artois, and Dutch beers like Heineken) are at the higher end, and Mexican beers (such as Dos Equis and Corona) are typically priced above most domestic brands but lower than the European beers. Craft beers, due to the low volume of many producers, have higher production costs and tend to be priced as high or higher than European brands.

As with other consumer products, per-unit beer prices vary by retailer, by season, by packaging, and by promotional opportunities. However, the price gradations in the market have remained consistent and identifiable for at least the past decade.

These data suggest a pricing differential of about $6 per case exists between premium domestics and German imports. The expectation of such a price differential was separately confirmed by Anheuser-Busch's own market research.

See the discussion in the June 26, 2014 report, including:

- "Consumer Damages" on page 16 of the June 26, 2014 report;
- Exhibit E-3. "Beck's Pilsner Volume and Pricing Data" in Appendix E of the June 26, 2014 report;
- Exhibit D-8. "Examples of Beck's and Budweiser Pricing at BevMo! Stores in California" in Appendix D of the June 26, 2014 report;
- Exhibit D-9. "Pricing Survey: Beck's and Budweiser Prices at Publix Stores in Florida" in Appendix D of the June 26, 2014 report; and
- Exhibit D-7. "Selected Pages from Exhibit 59 from deposition of Elizabeth Price Lee (Project Schnitzel)" in Appendix E to the June 26, 2014 report.

*Question 3:  "Assuming that consumers were confused about the origin of Beck's beer beginning in the year 2012, can we outline a methodology and a set of data that would enable us to estimate the following: (a) The likely price differential between a hypothetical German-originated Beck's and the actual American-originated Beck's; (b) The volume of Beck's beer that was purchased, the total consumer expenditures on these products, and the price differential embedded in these expenditures; and*

*(c) The volume, expenditures, and price differentials in the states of California, Florida, and New York, as well as the United States as a whole?"*

*Finding.* Assuming consumers were confused about the origin of Beck's beer in 2012 and following years, we can outline a methodology and set of data that would allow us to estimate all of these quantities and price differentials.

- See the section "Company and Brand Overview" on page 15, and "Beck's Family Pricing" on page 15 of the June 26, 2014 report.
- See Exhibit E-1. "Sample Calculation: Damages to Consumers Due to Misrepresentation of Beck's Pilsner's Origin, 2012, State of California" in Appendix E of the June 26, 2014 report.

*Question 4:* *"For those consumers who were confused beginning in 2012 about the origin of Beck's in the United States: (a) Is the number of such consumers large, and is the nature of their damages common among their large number? (b) Is the price differential a reasonable estimate of the damages they suffered?"*

*Finding.* The number of affected consumers is very large. Beck's beer is sold across the United States, and is one of the best-known European brands. Available aggregate data on sales within the US indicate that total Beck's volume was at least 6,900,000 cases in 2012, and it appears that the relevant products (Beck's beer in 6-packs and 12-packs) represent the majority of this volume.[1]

In general, American consumers operate in a well-defined market for beer, where European beers typically and consistently cost more to consumers than domestic beers. Both products contain similar basic ingredients, and are packaged and sold in a nearly identical manner. Hence, the small differences in brewing and ingredients, as well as the differences in the associated brand images, represent clear indicators of damages to consumers who thought they were buying one type of beer, but were actually buying another.

Because the market is well defined, with consistent price differentials between European and domestic beer products, the price differentials between those products is a reasonable estimate of the quantifiable damages to consumers from confusion about the product's origin.

- See the discussion under "Consumer Damages" on page 16 of the June 26, 2014 report.

---

1. The Beverage Information Group, *2013 Beer Handbook*, Beverage Information Group, USA, 2013. See also the discussion of volume below under "Potential Recovery: Demographic Method" and Exhibit 8.6 Reconciliation of Volume Information.

- See also exhibits cited there, including Exhibit E-3. "Beck's Pilsner Volume and Pricing Data" in Appendix E of the June 26, 2014 report; Exhibit D-8. "Examples of Beck's and Budweiser Pricing at BevMo! Stores in California" in Appendix D of the June 26, 2014 report; and Exhibit D-9. "Pricing Survey: Beck's and Budweiser Prices at Publix Stores in Florida" in Appendix D of the June 26, 2014 report.

- See also the findings above, which begin on page 6.

*Question 5: Using the data and methodology stated above, can we:*
*(a) calculate damages for consumers in the United States;*
*(b) calculate them separately for consumers in the states of Florida, California, and New York; and*
*(c) calculate damages for individuals, such as plaintiff class members?*

*Finding.* Using the data and methodology identified above, we can estimate the damages to consumers for confusion about the product's origin. Furthermore, because the industry is largely state-regulated under the three-tier system, we can separately estimate damages for consumers in specific states, including Florida, California, and New York.

A sample calculation for consumers in a state is provided. With additional information, we believe we could further refine this calculation and perform it for other states and for additional time periods.

A sample calculation is also provided for an individual class member, using a similar methodology. As with the calculations for consumers in individual states, we could with additional data refine this calculation.

- See Exhibit E-1. "Sample Calculation: Damages to Consumers Due to Misrepresentation of Beck's Pilsner's Origin, 2012, State of California" in Appendix E of the June 26, 2014 report.

- See Exhibit E-2. "Sample Calculation: Damages to a Class Member Due to Misrepresentation of Beck's Pilsner's Origin" in Appendix E of the June 26, 2014 report.

- See also the discussion of possible improvements to our estimates, if additional data were available, under "Consumer Damages" on page 16 of the June 26, 2014 report.

*Question 6: "Did Anheuser-Busch Inbev have a financial incentive to change the production of Beck's beer from Germany to the United States, and would it be possible to estimate the gains available to them from pursuing that incentive?"*

*Finding.* ABI, as with other importers of European (as well as Asian) brands of beer, had significant financial incentives to move production to the United States. That incentive largely consists in the significant savings on shipping from overseas ports, rather than shipping from within one or more US location. The costs of the ingredients used in beer production, while of course varying somewhat from location to location, are

relatively small factors compared to shipping, distribution, and marketing costs.

However, that incentive was tempered by the fact that consumers expect to pay a premium price for European beers. This price premium is consistent with the additional shipping costs and the product characteristics (including water, compliance with the Bavarian Beer Purity Law of 1516, and brewing practices and skill) they associate with these products. Consumers in this market, like any other market, would be reluctant to pay a premium price for the product attributes if they did not actually receive them. Indeed, this was confirmed by market research Anheuser-Busch commissioned regarding the Beck's brand.

Furthermore, AB InBev was clearly capable of establishing new brands of beer that were explicitly brewed domestically but had European product characteristics, and to some extent relied upon this image with some of their domestic brands (such as Budweiser). They chose instead to focus on brands that had historically been brewed in Europe.

Given the sophistication of the management of AB InBev, a knowledgeable investor would expect them to be capable of calculating the differences in shipping costs associated with moving production of Beck's to the United States, as well as any other cost differentials. In addition, they would have been motivated to do so, as well as motivated to consider the possible effect on consumers should they discover this change. The calculations actually done by AB InBev on "margin contribution" and other similar cost and managerial accounting concepts allow for a direct estimation of the financial incentive to AB InBev to move production without making that move apparent to consumers, and any associated gains from doing so.

- See Exhibit D-1. "Beck's Pilsner Margin Contribution Analysis, 2010-2013" in Appendix D of the June 26, 2014 report.
- See Exhibit D-3. "Selected Pages from Beck's Family Pricing Recommendation Report, Q4 2013" in Appendix D of the June 26, 2014 report.
- See also Exhibit D-7. "Selected Pages from Exhibit 59 from deposition of Elizabeth Price Lee (Project Schnitzel)" in Appendix D of the June 26, 2014 report.

## III.  Damages Analysis for Settlement Agreement

**SETTLEMENT TERMS**

The Court is currently considering a settlement between Anheuser-Busch Inbev (ABI) and the class represented in the case. Part of this settlement would involve class members submitting a simple claim form for a partial refund of purchases of Beck's beer during the period of May 2011-June 2015.[2] These refunds would be based on packaging type, numbers of units purchased, and ability to document purchase. The refunds would be issued on a per household basis and be subject to a cap.

We have examined the proposed settlement, as we now understand it, and have modeled the results. Our work includes the results of two methods of estimating the total potential recovery, which are summarized in the following tables:

- Table 1, "Refund Per Unit in Proposed Settlement Agreement," on page 12
- Table 2, "Cap on Household Refunds Per Year," on page 12
- Table 3, "Potential Recovery: Demographic Method," on page 14
- Table 4, "Potential Recovery: Sales Volume Method," on page 17

**MAXIMUM POTENTIAL RECOVERY ESTIMATES**

The two methods we use, as described further below, rely on different data sources and assumptions about claims, and the two methods are not expected to produce identical results. The range between the two estimates is an excellent indication of maximum potential recovery. We describe our assumptions and methods below, and summarize the recovery estimates in Table 6, "Summary: Demographic Method and Sales Volume Method," on page 19.

---

2. The Class Period, under the Settlement Agreement and the Court's Approval of June 23, 2015, is May 1, 2011 through June 23, 2015. This is 4 years, one month, and 23 days. We had detailed sales data for 4 years during this period and relied upon it as described in the text.

*Damages Analysis for Settlement Agreement*                                        *September 10, 2015*

**ASSUMPTIONS: SETTLEMENT PARAMETERS**

An extract of the settlement agreement is in Exhibit 6. The settlement terms reviewed are summarized below:

**TABLE 1. Refund Per Unit in Proposed Settlement Agreement**

| Packaging Type | Refund per Unit |
|----------------|-----------------|
| Six Pack of 12-oz bottles or cans | $0.50 |
| Four Pack of 16-oz cans | $0.50 |
| Twelve Pack of 12-oz bottles or cans | $1.00 |
| Twenty Pack of 12-oz bottles | $1.75 |
| Individual bottle or can | $0.10 |
| *Source: Proposed Terms in Settlement Agreement* | |

We assumed refunds for each year would be subject to the following limits per household, per year, based on proof of purchase:

**TABLE 2. Cap on Household Refunds Per Year**

| Submission | Cap per Household |
|------------|-------------------|
| Undocumented | $12 |
| Documented | $50 |
| *Source: Proposed Terms in Settlement Agreement* | |

## POTENTIAL RECOVERY: DEMOGRAPHIC METHOD

The Demographic Method estimates the potential recovery by identifying the number of beer drinking households in the US, and among them the number of Beck's drinking households, and then uses potential refund amounts for such households to calculate a maximum recovery amount.

In this analysis, we took the conservative approach of beginning with adult-headed households in the US during the most recent available year, and modestly increased this to calculate the number in the US during the approximate 4-year class period. (Adults move in and out of households, and people become adults and change their drinking habits, during any four year period. Therefore, the number of eligible adult drinkers across the entire class period is larger than for any one year.)

We used a conservative assumption that about half of all adult-headed US households have a beer drinker (someone who drank at least one beer during the past year) present. Note that this is not the same as prevalence in the general population of recent beer drinkers, which would be lower.[3]

We used market penetration data for Beck's, which indicates that it has a very small share of the imported beer market, to support an estimate of the share of beer drinkers that drank Beck's anytime during the approximate 4-year period. Note this is higher than the market share of Beck's in any one year. We again allowed for a larger number to account for those that drank Beck's anytime during an approximate 4-year period. (We estimated here the share of *beer drinkers* that purchased Beck's at any time during the year; this is larger than the volume share.)

There are no direct data available for these latter assumptions. We estimated them based on partial information contained in the following sources: volume share information from the Beverage Information Group's *Beer Handbook 2013* (which is also contained in the AEG expert report of June 26, 2014); US government and public health authority data on alcoholic beverage consumption among adults contained in "Exhibit 9. Distribution of Alcoholic Beverage Consumption" in the Appendix of Exhibits; and our own professional judgement.

Note that the product of these individual factors is critical in the calculation; we could have under-estimated the share of beer drinkers that drink Beck's, over-estimated the number of adult-headed households, and still had a reliable estimate of eligible households.

Finally, we used the maximum refund that can be claimed by households that do not provide documentation supporting their purchases. The resulting calculation provides an approximate maximum total recovery for members of the class.

- See Table 1 on page 12 for the recovery amounts.
- See Table 3, "Potential Recovery: Demographic Method," on page 14; see also "Exhibit 7. Potential Recovery: Demographic Method" in the Appendix of Exhibits for detailed calculation.

---

3. See a detailed discussion in "Exhibit 9. Distribution of Alcoholic Beverage Consumption" in the Appendix of Exhibits. These data use different definitions of "adults" and different categories of the drinking population. Our analysis is based on adult-headed households as estimated by the US Census Bureau, which is based on householders over the age of 24.

**TABLE 3. Potential Recovery: Demographic Method**

| | Four-year period | Memo |
|---|---|---|
| US Households with Adults | 121,315,902 | Allowance for changing households over 4-year period |
| Share: Beer Drinker HHs/ All Adult Households | 0.5355 | Allowance for changing behavior over 4-year period |
| Share: Beck's Drinkers / Beer Drinkers | 0.02625 | Includes allowance for regular, occasional, and infrequent users |
| Households Consuming Beck's | 1,705,322 | |
| Max Payoff, Assuming No Documentation | $12.00 | |
| **Total Potential Recovery** | **$20,463,870** | |

*Sources: US Census; AEG Assumptions; Beverage Information Group*
*Analysis: Anderson Economic Group, LLC,*
*See Exhibit 7.1*

## POTENTIAL RECOVERY: SALES VOLUME METHOD

The Sales Volume Method estimates the potential recovery by using volume sales data provided by ABI and potential refund amounts proposed in the Settlement for each package type to calculate a maximum recovery amount. The data provided by ABI was monthly sales data reported in barrels and broken down into type of beer, the wholesale packaging it was sold in, and the place of production. See Exhibit 5, "ABI Sales Data."

We determined the total maximum recovery amount in the following manner:

- Converting the sales data provided by ABI (in barrels), into the equivalent retail package in which the Beck's beer was sold.
- Selecting out the products that were produced outside of North America.[4] Sales of German-produced products presumably reflected inventory and product in transit when ABI first began production in the U.S. The share of these non-North American products was much smaller after the initial year of the class period.
- Applying the recovery payments to the packages sold during the class period.
- Applying an allowance for refunds that exceeded the cap amount. This is discussed further below.

This type of analysis was performed across the approximate four-year time period in question. Although shown in the yearly analysis, the cap applied to the entire class period, which extended over 4 years plus a month and some days.

**Comparison with Alternate Data Source on Sales Volume.** We compared the volume information on specific packages during the specific claim period with volume information on the same brand from another source. This other source, cited in the June 26, 2014 AEG report, indicated that ABI sold 6.9 million case equivalents of all package types in 2012. We reconciled the volume information of these two sources in Exhibit 8, "Potential Recovery: Sales Volume Method." There is a small unexplained discrepancy between the two sources, which is expected given the less-precise nature of the one-year estimate of sales volume from the alternate source.

**Truncation Due to Cap on Maximum Recovery per Household.** We also used a conservative assumption that about 20% of the potential recovery would be reduced due to the $50 rebate limit in the settlement. This is due to

---

4. See "Exhibit 6, Extract of Tentative Settlement Agreement." The definition of "Beck's Beer" is limited to products "brewed and sold in the United States."

the disproportionate share of alcoholic beverages that are purchased by a small share of the population. We base this on a detailed analysis of the data available on this distribution of consumption, recognizing the difficulties associated with survey data on alcohol use. We also provide example calculations illustrating households that would reach the cap before receiving payment for all products purchased. For these, see " Exhibit 9. Distribution of Alcoholic Beverage Consumption" in the Appendix of Exhibits.

For a summary of these calculations see Table 4 on page 17. For more detailed calculations on a year-by-year basis, see Exhibit 7 in the Appendix of Exhibits.

*Damages Analysis for Settlement Agreement*                    *September 10, 2015*



## COMPARISON: DEMOGRAPHIC METHOD VS. SALES VOLUME METHOD

The Demographic Method provides an estimate for the maximum total recovery for members of the class, assuming no documentation is provided by households. The Sales Volume Method provides an estimate for the maximum total recovery for members of the class, assuming that all purchases have the necessary supporting documentation.

There are two reasons we would expect the maximum total recovery estimates between the Demographic Method and the Sales Volume Method to differ:

1. The terms of the settlement allow for larger rebates to households that have supporting documentation. This means that the maximum recovery per claim is higher with the Sales Volume Method than with the Demographic Method.

2. The maximum recovery available for households that document would be limited for high consumption households. This is due to the $50 per household limit, which would truncate payments to households claiming, for example, the equivalent of one twelve-pack per week for an entire year (or one twelve pack every 3 weeks over a 4-year period). This requires us to use a truncation to account for the distribution in the Sales Volume Method. We provide an extended discussion of the underlying data on distribution of alcoholic beverage consumption, and support for the truncation parameter, in " Exhibit 9. Distribution of Alcoholic Beverage Consumption" in the Appendix of Exhibits.

For a direct comparison between the two methods, see Table 6, "Summary: Demographic Method and Sales Volume Method," on page 19.

### TABLE 6. Summary: Demographic Method and Sales Volume Method

|  | Demographic Method[a] | Sales Volume Method[b] |
|---|---|---|
| Primary Method of Analysis | Demographic and Market Share Data | Volume Sales Data |
| Documentation of Purchases Assumed | No | Yes |
| Max Payoff Amount per Household | $12.00 | $50.00 |
| Estimated Maximum Potential Recovery | $20,463,870 | $28,885,420 |
| *Analysis: Anderson Economic Group, LLC* | | |

a.  See Exhibit 7.1 for calculation.

b.  See Exhibit 8.1 for calculation.

**DECLARATION**            Based on the following:

- The data assembled, the analysis performed, and the findings stated in the June 26, 2014 report,
- The sales data received, and information regarding a possible settlement, and
- The clarification on sales data, additional data, and subsequent analyses performed regarding the proposed settlement; and
- The determinations of the Court contained in the September 5, 2015 order;

I declare the following:

*Finding.* The analysis of consumer damages contained in the June 26, 2014 report is correct, and founded upon reliable data. In particular, consumers who purchased Beck's believing they were purchasing an imported German beer, and in fact receiving an American beer, were damaged by an amount that is reasonably approximated by the price difference between a premium German lager and a premium American lager.

*Finding.* The Court observes that the "premium price theory of damages has been accepted by multiple courts" in their Order (on page 20). This theory, as we understand it from the Court's order, is consistent with the economic logic underlying our damages estimate.

*Finding.* Information from the beer market, including advertising, labeling, and reporting of data available to the general public, as summarized in the June 26, 2014 report, suggests that the large majority of consumers who purchased Beck's during the period 2012-2015 would have been confused regarding the country of origin of Beck's beer. The Court's determination that they were confused as a matter of law is consistent with that market observation.

*Finding.* One method of estimating consumer damages (Demographic Method), provides a reliable indication of the potential maximum recovery to the class available under the Proposed Settlement Agreement assuming no documentation. We summarize this analysis above in Table 3, "Potential Recovery: Demographic Method," on page 14.

*Finding.* An alternate method of estimating consumer damages (Sales Volume Method), provides an indication of the potential maximum recovery to the class available under the Proposed Settlement Agreement assuming all purchases were documented. We summarize this analysis above in Table 4, "Potential Recovery: Sales Volume Method," on

page 17.

*Finding.* Using the Demographic Method, I estimate the maximum recovery for members of the class to be approximately $20.4 million. Using the Sales Volume Method, I estimate the maximum recovery for members of the class to be approximately $28.8 million. Given that both methods provide similar estimates and rely on completely different data sets and sources, I am confident that the range provided by the two estimates is an accurate estimate of the maximum recovery amount.

**CONCLUSION**

The opinions expressed herein represent my best professional judgment, using the proper methodology and standards, within a reasonable degree of certainty. Should additional facts become available, I may qualify, extend, or revise the conclusions in this memorandum and the analysis contained in the attached report.

I declare under penalty of perjury that the foregoing is true and correct.

x_____

Date executed: September 10, 2015, at East Lansing, Michigan.

*September 11, 2015*

# IV.  Appendix of Exhibits

Exhibit 1.  *Curriculum Vitaes*

Exhibit 2.  Representative Clients of Anderson Economic Group

Exhibit 3.  Statement of Ethical Principle and Tenets of Practice

Exhibit 4.  Industry Data
   *4.1 Industry Brief: The Economic Structure of the U.S. Alcoholic Beverage
       Industry*
   *4.2 Countries, Tastes, and the Value of Beer Franchises in the
       United States (Abstract)*
   *4.3 Alcoholic Beverage Consumption by Major Category, U.S., 2007-2012*
   *4.4 Consumption of Beer by Category, U.S., 2007-2012*
   *4.5 Consumption of Leading Imported Brands, U.S., 2007-2012*

Exhibit 5.  ABI Sales Data

Exhibit 6.  Extract of Tentative Settlement Agreement

Exhibit 7.  Potential Recovery: Demographic Method
   *7.1 Potential Recovery: Demographic Method*

Exhibit 8.  Potential Recovery: Sales Volume Method
   *8.1 Potential Recovery: Sales Volume Method*
   *8.2 Sales Volume Method: Conversion from Barrels to Case Equivalent Vol-
       ume of Beck's Sold, 3-year Period*
   *8.3 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate
       Amount, 2012*
   *8.4 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate
       Amount, 2013*
   *8.5 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate
       Amount, 2014*
   *8.6 Reconciliation of Volume Information*

Exhibit 9.  Distribution of Alcoholic Beverage Consumption

Exhibit 10.  List of Data and Documents Reviewed

© 2015, Anderson Economic Group, LLC

*September 11, 2015*

Exhibit 1. Curriculum Vitaes

© 2015, Anderson Economic Group, LLC

# Patrick L. Anderson

*Curriculum Vitae*
*with Supplemental Information*

## Employment History

*September 1996-present*

**Principal, Anderson Economic Group LLC**

- Principal and Chief Executive Officer of a business consulting firm serving clients in the public, private, and non-profit sectors. Practice areas include Market & Industry Analysis; Public Policy; and Strategy & Business Valuation.

- Past government clients include:

    State of Michigan, State of Wisconsin, State of North Carolina, State of Kentucky, State of Ohio, Province of Ontario; Transport Canada; City of Detroit, Michigan; City of Norfolk, Virginia; City of Fort Wayne, Indiana; City of Cincinnati, Ohio; Detroit-Wayne County Port Authority; Collier County, Florida; Lansing Charter Township, Michigan; Cass County, Michigan; Oakland County, Michigan; Van Buren County, Michigan; and other cities, counties, and townships.

- Past business clients include:

    General Motors Corporation, DaimlerChrysler Corporation, Honda North America, Ford Motor Company, Porsche Cars North America, Delphi, Visteon, PG&E Generating, Wolverine Power, ITC Holdings, Labatt USA, Inbev USA, Beck's North America, The Gambrinus Company, Heineken USA, Diageo-Guinness, NWS Distributors, Kmart Corporation, SBC and SBC Ameritech, Taubman Centers Inc., Detroit Lions Inc., Palace Sports & Entertainment; automobile dealers or associations representing BMW, Ford, Lincoln-Mercury, Toyota, Cadillac, Chevrolet, Chrysler, Honda, Suzuki, Harley-Davidson, and Mercedes-Benz vehicles; franchisees representing Avis, Crown Plaza; and Budweiser, Miller, Coors, Mondavi, Red Bull, and other beverage brands.

- Past nonprofit clients include:

    Michigan State University, Wayne State University, University of Michigan, University of Chicago, America's Urban Campus, Chicago Loop Alliance, Michigan Independent Colleges & Universities; Van Andel Institute, the American Automobile Manufacturers Association, Business Leaders for Michigan, International Mass Retailers Association, Michigan Retailers Association, Michigan Manufacturers Association, Michigan Chamber of Commerce, Hudson Institute of Indiana, Heritage Foundation, Brookings Institution, Michigan Catholic Conference, Telecommunications Association of Michigan, Michigan Association of Realtors, Service Employees International Union, West Virginia High Technology Consortium, Michigan Education Association, National Education Association, Nature Conservancy, Project Management Institute, and Automation Alley.

- Company offices are in East Lansing, Michigan, and Chicago, Illinois.

- The company website is: http://www.andersoneconomicgroup.com.

© 2015 AEG LLC. See "Copyright Notice" on page 26.

*Patrick L. Anderson, Curriculum Vitae, page 2*

*January 1995-September 1996*

**Chief of Staff, Michigan Department of State**

- Managed Department of State operations for Secretary of State Candice S. Miller, including: 180-branch office network; law enforcement unit; administrative law hearings on traffic safety, campaign finance & election law; automobile dealer regulation; licensing of drivers and automobiles; collection of sales & use and registration taxes on automobiles, trucks, boats, motorcycles, and other vehicles; International Registration Permits for interstate truckers; the Michigan Historical Center and State Archives; the Bureau of Elections; the Office of the Great Seal; and uniform commercial code filings.

- Responsible for annual operating budget of $175 million, and 2,100 employees.

- Responsible for operations with annual tax collections of $1.4 billion.

*February 1994-December 1994*

**Deputy State Budget Director, Michigan Department of Management and Budget**

- Managed State of Michigan presentations to bond rating firms Standard & Poor's and Moody's covering state's fiscal and economic structure, ability to repay debt, and budget practices.

- Assisted Governor John Engler in campaign for passage of "Proposal A," the landmark constitutional tax and school finance reform; outlined tax statutes protected under Constitution; advised Budget Director on terms for the sale of the Accident Fund; developed recommendations for Secchia Commission on brownfield redevelopment and wetland banking.

*June 1987-December 1993*

**Assistant Vice President, Alexander Hamilton Life Insurance Company**

- Member of Investment and Asset-Liability committees with responsibility for investments that grew from $3 billion to over $5 billion, during which time the firm maintained an A+ financial rating from AM Best.

- Directed asset-liability management project for insurance company.

- Initiated cyclical analysis of high-yield bond portfolio.

# Other Executive Duties

*2006-present*

**Chairman, *Michigan Remembers 9-11 Fund***

- Founder and trustee of charitable organization committed to preserving the memory of people that died in the terrorist attacks of September 11, 2001 and of those Americans who helped others at that time.

- Organization website is: http://www.michiganremembers.org.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 3*

*2012-present*

**Executive Chairman, Supported Intelligence LLC.**

- Founder of company that develops and markets innovative valuation and risk assessment software.

- Served as Acting CEO until September 2012, when President and COO appointed.

- Company website is: http://www.supportedintelligence.com.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 4*

## Education

*University of Michigan, Ann Arbor, Michigan*

- B.A., Political Science, 1981.
- Masters in Public Policy, 1983.

*Additional Studies*

- Advanced Techniques in Economics, Carnegie-Mellon University, 1984;
  Leadership Michigan, Michigan Chamber of Commerce, 1991;
  Environmental Economics and Risk Analysis, Harvard University, 1997.

## Honors

- Recipient in of 2014 Neil Staebler Distinguished Service Award for "outstanding professional achievement consistent with Neil Staebler's dedication to excellence in public service;" University of Michigan Gerald R. Ford School of Public Policy.

- Winner of 2013 Edmund A. Mennis Award for "best contributed paper" to the journal *Business Economics*, awarded by the National Association for Business Economics, September 2013, San Francisco, CA; for the article "Policy Cost Uncertainty and Persistent Unemployment."

- Winner of the 2009 Abramson Scroll Award for "exceptional feature article" published in the journal *Business Economics*, awarded by the National Association for Business Economics, October 2009, St. Louis, MO; for the article "The Value of Private Businesses in the United States."

- Winner (with Ilhan K. Geckil) of the 2004 Edmund A. Mennis Award for "best contributed paper" to the journal Business Economics, awarded by the National Association for Business Economics, October 2004, Philadelphia, PA; for the article "Pocketbook Issues and Presidential Elections."

- Honoree in 2006 for the Distinguished Alumni Award awarded by the Michigan Chamber of Commerce Foundation for civic contributions and professional achievement among alumni of the Leadership Michigan program.

## Appointments and Memberships

- Elected member of Board of Directors, Michigan Chamber of Commerce, 2005-2010.
- Adjunct Fellow, The Hudson Institute, 1997-2002.
- Appointed by Governor John Engler to Trustee of the State Employees Retirement System (1994-1995), representing state employees.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 5*

- Appointed by Governor John Engler to the Blue Ribbon Commission on the Headlee Amendment (1991-1992); principal author of its report.

- Appointed by the Michigan Legislature to the Michigan Consumers Council, 1985-1990; elected vice-chair for 1985-1988 terms.

- Honorary Board Member, American Southeast Europe Chamber of Commerce, 2011-present.

- Member, National Association for Business Economics, 1983-present.

- Member, National Association of Forensic Economists, 2002-present.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 6*

## Published Works, 1985-2013

### Books and Book Chapters

*The Economics of Business Valuation: Toward a Value Functional Approach,* Stanford University Press, 2013.

Extended chapter material for *The Economics of Business Valuation,* in *Solutions Manual to Economics of Business Valuation,* (Erin Grover, editor), Anderson Economic Group, 2013.

*Guide to Recursive Models,* Supported Intelligence, 2013.

*Business Economics and Finance: Using Simulation Models, MATLAB, and GIS, Boca Raton, Florida, CRC Press, 2004.*

*Applied Game Theory and Strategic Behavior,* Boca Raton, Florida, CRC Press, 2009 (with Ilhan K. Geckil).

"New Developments in Business Valuation," in *Developments in Litigation Economics,* New York, Elsevier, 2005.

*State Economic Handbook, 2008* (executive editor), Palgrave MacMillan, 2007.

*State Economic Handbook 2009,* (executive editor), Palgrave MacMillan, 2008.

*State Economic Handbook 2010,* (executive editor), Palgrave MacMillan, 2009.

### Contributions to Journals, Proceedings, and Annual Reports

"Policy Cost Uncertainty and Persistent Unemployment," *Business Economics,* Vol. 49, No. 1, pp. 2-20; Spring 2014.

"The Value of Private Businesses in the United States," *Business Economics,* vol. 44, no. 2, pp. 87-108; April, 2009.

"Pocketbook Issues and the Presidency," *Business Economics,* October 2004.
Winner of Edmund A. Mennis Contributed Paper Award of the National Association for Business Economics, with Ilhan K. Geckil.

"Real-world Productivity with Geographic Information Systems," *Proceedings of the 2002 e-gov Conference*, [track 3-4, *"Geographically-Enabled Data – Sharing and Establishing Standards"],* Washington DC, E-gov, July 2002.

"How a 'Climate Change' Treaty Might Affect the Auto Industry," *State of the Great Lakes 1997 Annual Report*, Lansing, MI: Michigan Department of Environmental Quality, 1998.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 7*

*Towards a User-Friendly Government: The Secchia Commission Report,*
Lansing, Michigan: Michigan Department of Management and Budget, 1994
("wetland banking" and "brownfield redevelopment" recommendations).

"Forces of Free Trade," *Prospects for North American Trade Relations Beyond the 1980's,*
Ralph Cowan, editor; Windsor, Canada: University of Windsor, 1985.

### Monographs

*The Talent Nexus: Michigan's University Research Corridor,* University Research Council (University of Michigan, Michigan State University, Wayne State University, forthcoming May 2015 (with Alex Rosaen).

*Tax Note: Likely Effect of Michigan Proposal 2015-1,* Anderson Economic Group, Feb 2015.

"Effect of Proposal 2015-1," memorandum to Michigan Chamber of Commerce (with Alex Rosaen), published by Michigan Chamber of Commerce via website and newsletter, Jan. 2015.

*Analysis of 2014 Proposal 1: Personal Property Tax Reform*, commissioned by Small Business for Michigan, Anderson Economic Group, July 2014 (with Alex Rosaen and Jason Horwitz).

*Innovating for the Blue Economy: Water Research at the URC,* University Research Corridor and Anderson Economic Group, May 2014 (with Alex Rosaen).

*The Business of Music in Metro Detroit*
Anderson Economic Group LLC and Crain's Detroit Business, September 2013.

*Michigan's University Research Corridor: Annual Economic Impact Report,* 1st through 7th editions; University Research Corridor and Anderson Economic Group, Commissioned by Michigan's University Research Corridor (URC) annually from 2007 to 2013, [co-author or author of foreword].

*Automation Alley's Annual Technology Industry Report*
Automation Alley and Anderson Economic Group, Commissioned by Automation Alley, Troy, Michigan, 2005, 2006, 2007, 2008, 2011, and 2012; some editions with foreword by Patrick Anderson.

*The Cost of Aquatic Invasive Species to Great Lakes States*
Nature Conservancy of Michigan and Anderson Economic Group, Commissioned by Nature Conservancy of Michigan, Lansing, Michigan, March 2012, (with Alex Rosaen, Erin Grover, and Colby Spencer).

*Michigan Unplugged? The Case for Shared Investment in Regional Transmission Projects*
Anderson Economic Group, Commissioned by ITC Holdings Corp., Novi, Michigan, June 2011, with Scott Watkins and Alex Rosaen.

*Dollars and Sense: How State and Local Government in Michigan Spend Your Money*
Anderson Economic Group, Presented by Governor Rick Snyder, 2011.

*Effectiveness of Michigan's Key Business Tax Incentives*
Michigan Education Association and Anderson Economic Group, Commissioned by the National Education Association and the Michigan Education Association, March 2010, (with Alex Rosaen and Hilary Doe).

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 8*

*Michigan's Business Tax Incentives*
Anderson Economic Group, Commissioned by the National Education Association and the Michigan Education Association, May 2009, with Theodore Bolema and Alex Rosaen.

*Automotive Industry Advisory Service,* subscription reports
Anderson Economic Group, October-December 2008, with Ilhan K. Geckil.

*Taxpayer Cost of Federal Financing of Auto Manufacturers Compared with Likely Costs of Bankruptcy*
Anderson Economic Group and BBK Ltd, December 2008, with Kriss Andrews.

*Economic Impact of Proposed MSU Facility for Rare Isotope Beams (FRIB)*
Anderson Economic Group, Memorandum to President Lou Anna Simon, Michigan State University (public summary), East Lansing, MI: Michigan State University (Science and Jobs for Michigan task force), 2008, with Caroline Sallee.

*Tax Burden and Distribution of "Stimulus" Payments*
Anderson Economic Group Public Policy and Economics Bulletin 2008-1, January 2008, with Caroline Sallee.

*Role of Blue Cross in Michigan's Health Insurance Market*
Anderson Economic Group, Commissioned by the Coalition for Access and Affordability in Michigan, November 2007 (with Caroline Sallee and Darci Keyes).

*Review of Governor Granholm's 2007 Tax Restructuring Plan*
Michigan Chamber of Commerce and Anderson Economic Group, March 2007, with Caroline Sallee.

*Benchmarking for Success: A Comparison of State Educational Performance*
Michigan House of Representatives and Anderson Economic Group, Commissioned by the Michigan House of Representatives, December 2006, with Scott D. Watkins.

*Fiscal Analysis of the "K16" Proposal*
Anderson Economic Group, Commissioned by the Michigan Chamber of Commerce and Michigan Association of Realtors, October 2006, with Alex Rosaen and Caroline Sallee.

*Benchmarking for Success: A Comparison of State Business Taxes*
Michigan House of Representatives and Anderson Economic Group, Commissioned by the Michigan House of Representatives, August 2006, with Caroline Sallee.

*The Tax Burdens of Michigan's Single Business Tax*
Anderson Economic Group, Commissioned by the Michigan Manufacturers Association, May 2005, with Ilhan K. Geckil.

*The Economic Benefits of Wayne State University*
Anderson Economic Group, Commissioned by Wayne State University, Detroit, Michigan, October 2004, with Scott D. Watkins and Ilhan K. Geckil.

*Fiscal Stability Analysis for Collier County, Florida*
Anderson Economic Group, Commissioned by Collier County, Florida EDC, September 2004, with Scott D. Watkins and Ilhan K. Geckil.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 9*

*The Life Sciences Industry in Michigan: Employment, Economic, and Fiscal Contributions to the State's Economy,* Anderson Economic Group, Commissioned by the Van Andel Institute, Grand Rapids, Michigan, January 2004, with Scott D. Watkins.

*Michigan Business Corporation Act Amendments: A Shareholder Rights Perspective*, Anderson Economic Group, Commissioned by the Taubman Company, May 2003.

*A Hand Up for Michigan Workers: Michigan Earned Income Tax Credit,* Anderson Economic Group, Commissioned by the Michigan Catholic Conference, November 2002, with Caroline Sallee.

*Expanded School Sinking Fund Taxes: Infrastructure Investment, or Backtracking on Proposal A?* Anderson Economic Group, Commissioned by the Michigan Chamber of Commerce Foundation, June 2002, with Scott D. Watkins and Ilhan K. Geckil.

*Fiscal Analysis of the "Link Michigan" Proposal,* Anderson Economic Group, December 2001 (with Ilhan K. Geckil and Chris Cotton).

*Economic and Financial Impact of an Expansion in the Port of Detroit* Anderson Economic Group, Commissioned by the Detroit/Wayne County Port Authority, August 2001, with Ilhan K. Geckil.

*Diversification and High-Tech Employment in Oakland County* Anderson Economic Group, Commissioned by Oakland County, April 2001, with Ian K. Clemens and Chris Cotton.

*Failing Schools in Michigan: The Surprising Scale* Anderson Economic Group, Commissioned by Choices for Children, February 2001, with Christopher S. Cotton.

*Michigan's Sales Tax & the Boating Industry* Anderson Economic Group, Commissioned by the Michigan Boating Industries Association, January 2001.

*Michigan Retailers Salary Survey* Anderson Economic Group, Commissioned by the Michigan Retailers Association, October 2000; contributor also to the 2002 and 2004 updates.

*The Michigan Telecommunications Act: Impact on Consumers* Anderson Economic Group, October 2000, with Ian Clemens and Priya Marwah.

*Michigan Business Climate Benchmarking Update Study* Anderson Economic Group, Commissioned by the Michigan Economic Development Corporation, March 2000, with Ian Clemens.

*Economic and Financial Assessment of a Change in Residency Requirements in the City of Detroit* Anderson Economic Group, Commissioned by the City of Detroit, December 1999.

*A Report on the Demographics of Michigan's Urban Brownfield Communities* Anderson Economic Group, December 1999.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 10*

*Diversification in the Michigan Economy*
Commissioned by the Michigan Economic Development Corporation, August 1999, with Ian Clemens.

*The Effect of Environmental Justice Policy on Business*
Commissioned by the US Council of Mayors; updated for the Michigan Manufacturers Association, 1998.

*Prefunding The Sales Tax*
Anderson Economic Group, Commissioned by the Michigan Retailers Association, 1997.

*The Tax Limits in Proposal A*
Anderson Economic Group, Commissioned by the Michigan Chamber of Commerce, 1997.

*The Universal Tuition Tax Credit: A Proposal to Advance Parental Choice in Education*
The Mackinac Center for Public Policy, 1997, with Richard McLellan, Joseph P. Overton, and Gary Wolfram.

*How the Headlee Amendment Protects Michigan Taxpayers, 4th ed. revised*
Taxpayers United for the Michigan Constitution, 1993.

*Proposal A: An Analysis of the June 2, 1993 Statewide Ballot Question*
The Mackinac Center, 1993.

*Analysis of Tax Proposals on the 1992 Ballot*
The Mackinac Center, 1992.

*Detroit Economic Development Plan*
Economic Enterprise Foundation of Detroit, 1988.

*The Single Business Tax Burden on Michigan Industries*
The Mackinac Center, 1987.

*Michigan in the Current Recovery: A Historical Perspective*
The Heartland Institute, 1986.

### Working Papers

"Using Recursive Methods for Estimating Commercial Damages: Three Case Studies," AEG working paper 2015-1, presented at the ASSA annual conference, Boston MA, January 2015 (with Jeff Johnson and Walter McManus).

"Estimating Value and Damages for Start-up Firms: Lessons from a Case Study," AEG working paper 2013-2, presented at the Illinois Economic Association 2013 Annual Meeting, October 2013.

"The Value of a Controlling Interest in an Expropriated Oil & Gas Company: YPF SA," AEG working paper 2013-1, [also Technical Paper 2013-1 for Supported Intelligence, LLC], March 2013.

"Discount Rates in a Depression," AEG working paper 2009-1, presented at the National Association for Forensic Economics, Dublin, Ireland, May 2009.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 11*

"A Dynamic Programming Approach to Estimating Commercial Damages," AEG working paper 2009-1, presented at the ASSA Conference, San Francisco, California, January 2009.

"Sports Franchise Valuation: The Chicago Cubs," AEG working paper 2007-03, March 2007, with Ilhan K. Geckil.

"Sports Franchise Valuation: The Contender Factor," AEG working paper 2007-01, March 2007, with Ilhan K. Geckil.

"Estimating Antitrust Damages," AEG working paper 2007-2, presented at Allied Social Science Association conference, Chicago, IL, January 2007 with Ilhan K. Geckil and Ted Bolema.

"Three Essential Factors in Business Valuation," AEG working paper 2007-1, presented at Allied Social Science Association conference, Chicago, IL, January 2007, with Ilhan K. Geckil and Nicole Funari.

"Practical Use of Game Theory in Forensic Economics," AEG working paper 2006-6, presented at the National Association of Forensic Economics International Conference, Florence, Italy, May 2006, with Ilhan K. Geckil.

"Economic Impact of Superbowl XL," AEG working paper 2006-2, February 2006, with Scott Watkins.

"Lost Profits, Diminished Value, and Other Measures of Commercial Losses," AEG working paper 2005-11, presented at the Southern Economics Association meeting, Washington, D.C., November 2005.

"Likely Impact of Delphi Bankruptcy," AEG working paper 2005-10; with Ilhan K. Geckil and Caroline M. Sallee.

"Practical Dynamic Programming for Business and Forensic Economics," AEG working paper 2005-5, presented at the National Association of Forensic Economics International Conference, Dublin, Ireland, May 2005.

"Countries, Tastes, and the Value of Beer Franchises in the US," AEG working paper 2004-6, presented at the National Association of Forensic Economics International Conference, Edinburgh, Scotland, May 2004.

"Valuation and Damages for Franchised Businesses," AEG working paper 2003-12, presented at the Allied Social Sciences Association annual meeting, San Diego, CA, January 4, 2004.

"Northeast Blackout Likely to Reduce US Earnings by $6.4 Billion," AEG working paper 2003-2; with Ilhan K. Geckil.

"Lost Earnings Due to a West Coast Port Shutdown," AEG working paper 2002-10, with Ilhan Geckil, October 15, 2002.

"Light Trucks and Compact Cars: Which Protect Their Occupants Better?" AEG working paper 99-01, June 21, 1999.

### Selected Articles, Trade Publications

"Michigan Economy is Becoming Healthy Again," *Greater Lansing Business Monthly,* April 2012.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 12*

"Social Responsibility and the Small Business," *Greater Lansing Business Monthly,* August 2011.

"Authorized and Unauthorized Property Tax Millages in Michigan," *Property Tax Alert, Commerce Clearing House, June 2001.*

Editor, and author of many articles, in *Investment Watch*, published periodically by Alexander Hamilton Life Insurance Company of America, 1990.

Editor, and author of numerous articles, in *Quarterly Economic News*, published quarterly by Manufacturers National Bank of Detroit, 1983-1986.

### Articles in Periodicals of General Circulation

"Keep limits: Longer time in office won't fix state," *Detroit Free Press,* March 1, 2010.

"State has assets for a rebound," *The Detroit News,* January 1, 2010.

"Demand better performance for money put into schools," *Detroit Free Press,* January 18, 2007.

"Unemployment Problems Require Action to Reduce Taxes and Improve the Skills of the State's Workforce," *The Detroit News,* Sunday November 28, 2004.

"Remembering Headlee, A Champion of the Taxpayer," *Detroit Free Press,* November 11, 2004.

"Federal Gas Tax," *The Detroit News,* April 18, 2004.

"State Must Hold To Account Our Public Schools," *Lansing State Journal*, January 18, 2004.

"Additional Spending Won't Fix Problems," *The Detroit News*, December 7, 2003.

"Rewards of a New State Tax Credit," *Detroit Free Press*, November 28, 2003.

"Let Shareholders, Not Lawyers, Decide Fate of Michigan Firms," *The Detroit News,* June 3, 2003.

"Wrong Move for State is to Increase Taxes," *Lansing State Journal*, January 12, 2003.

"Investment in Structures Explodes," *The Detroit News,* September 15, 2002.

"N.Y. Attack Reveals Nation's Greatness," *The Detroit News,* December 31, 2001.

"Higher Fuel Economy Rules Imperil American Auto Jobs," *The Detroit News*, August 23, 2001.

"Confront Facts: Schools Failing," *Lansing State Journal*, March 11, 2001.

"Michigan Undervote Could Outweigh Florida's," *The Detroit News*, December 13, 2000.

"The Lack of Evidence in Palm Beach," *National Review Online*, November 15, 2000.

"Michigan's High Court Sides with Taxpayers," with Richard Headlee, *The Detroit News*, October 4, 2000.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 13*

"E-Commerce Made Easy for Michigan Business," *Michigan Forward*, April 2000.

"Time is Right for Tax Cut for Working Poor," *The Detroit News*, January 31, 2000.

"It's Time for a State Tax Cut," *The Daily Press*, January 10, 2000.

"Microsoft is Indeed a Cyber Bully," *The Detroit News*, November 11, 1999.

"Residents, Prepare for Your Tax Refund," *Detroit Free Press*, October 11, 1999.

"When Michigan Couldn't Pay its Bills," *Michigan Political History Society News*, Vol. 6. No. 2, summer 1999.

"Cities: Take Advantage of Urban Homesteading," with John Weicher and Jeffrey Reno, *The Detroit News*, July 17, 1999; similar article also in *Lansing State Journal*, August 8, 1999.

"For Education Quality, Put Kids First," *Michigan Forward*, June 1999.

"Give Detroit Pupils a Chance with School Choice," *The Detroit News*, Sunday June 6, 1999.

"On Earth Day, Detroit and Freedom Remain Under Attack," *The Detroit News*, April 22, 1999.

"Tax Credit Would Improve K-12 Schools," *The Detroit News*, January 3, 1999.

"US Strong and Secure Enough to Survive Senate Trial," featured letter, *USA Today*, December 24, 1998.

"Mercedes Plant Reflects Chrysler's Future," *The Detroit News*, June 12, 1998.

"Unstinting Book Takes Tough Look at Health Care," *The Detroit News*, March 27, 1998.

"'Green Cars' Politically Correct, but Who Can Afford to Buy One?" *The Detroit News*, January 12, 1998.

"What Silicon Valley Can Learn form Detroit," *The Wall Street Journal*, December 29, 1997.

"Engler's Pro-business Philosophy Paved the Way for Michigan's Growth," *Detroit Free Press*, November 16, 1997.

"Michigan Will Be Better For Term Limits," *The Macomb Daily*, July 23, 1997.

"Hometown Fed Member Gives State a Better Voice," *Detroit Free Press*, July 14, 1997.

"Term Limits Open Political Process to Everyone," *The Oakland Press*, July 8, 1997.

"Taxpayers May Be Singed By Durant Case," *The Detroit News*, April 27, 1997.

"If Lansing Mandates it, Lansing Should Pay For It," *Detroit Free Press*, February 4, 1997.

"Real Reform Puts People Back in Campaigns," *The Detroit News*, November 10, 1996.

"Does It Still Matter Who is Governor?" *The Detroit News*, Nov. 4, 1994.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 14*

"Business Friendly Legislation," *The Detroiter*, October, 1994.

"The Original Free-Market Environmentalists," *The Detroit News*, Sept. 22, 1993.

"Time to Strengthen the Headlee Amendment," *Viewpoint*, 93-5, The Mackinac Center for Public Policy, Midland MI; 1993.

"Michigan Needs Term Limits," article, *Michigan Forward*, October 1992.

"Tiger Stadium Tax is Unconstitutional," *Viewpoint*, 92-9, The Mackinac Center for Public Policy, May 25, 1992.

"Stadium Tax Tramples Michigan's Constitution," *The Detroit News*, Apr. 26, 1992.

"Tax Cut Plans: Which One Will Do the Job?" *The Detroit News*, Sept. 15, 1991.

"Ripped Off: Taxpayers Suffer Despite Headlee," *The Detroit News*, Aug. 11, 1991.

"Choice Saves Schools," *Consider* magazine, Feb. 11, 1991.

"Property Tax Limitation is Citizens' Job," *The Detroit News*, Feb. 4 1990.

"What They Don't Say About Proposal B," *The Detroit News*, Oct. 8 1989.

Host: "An Old Con in a New Set of Clothes," *Executive Comment*, The Mackinac Center for Public Policy, March 1989.

"Putting Detroit on the Path of Growth," *The Detroit News*, Jan. 29 1989.

"Michigan Will Fare Well Under Bush's 'Reaganomics'," special column, *The Detroit News*, Nov. 3, 1988.

"Michigan's Stake With Bush," article, *The Bay City Times* and other Booth Newspapers, Oct. 1988.

"Dual Tax System Double Trouble for Business," *The Detroit News*, June 5, 1988.

"Job Training Programs' or Welfare in Disguise?" *The Detroit News*, June 11, 1987.

"The JOA: Readers Would Suffer Most," *The Detroit News*, May 8, 1987.

"State 'Tax Relief': Let the Payer Beware," *The Detroit News*, Mar 15, 1987.

"Michigan's 'Exodus' a Sign of Basic Flaws," *The Detroit News*, Feb. 8, 1987.

"Americans Get What They Pay For," *The Detroit News*, Jan. 20, 1987.

"Michigan: Rich State, Poor State," *The Detroit News*, Dec. 21, 1986.

"High Taxes Mean Low Growth," *The Detroit News*, May 6, 1986.

"A Passion for Excellence," *The Detroit News*, 1985.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 15*

"Now It's Time to Get Moving on State Taxes," *The Wall Street Journal*, Dec. 19, 1985.

*Note: In most cases, the title of an article in a newspaper is determined by the editor, not the author; and page numbers and titles may vary with editions.*

### Published Regulatory Comments and *Amici Curiae*

Comment on Proposed IRS regulations on "qualified appraiser" and "qualified appraisal," under section 170(f) of the Internal Revenue Code; January 2007, co-signed by six other economists.

*Amicus Curiae* to the US Supreme Court, *Leegin Creative Leather Products v PSKS,* No. 06-480; on antitrust laws and the "per se" rule, submitted by Ted Bolema.

### Referee Assignments

*Journal of Forensic Economics*

*Journal of Legal Economics* (2008-2009)

*CRC Press* (Economics & Finance)

*Note: Most reviewer and referee assignments involve reviews of nonpublished drafts by undisclosed experts selected by the editor of the publication.*

### Continuing Professional Education Seminars

National Association of Dealer Counsel, 2015 Annual Meeting (see "Presentations")

National Association of Dealer Counsel, 2014 Annual Meeting (see "Presentations")

"How Does Michigan Succeed in These Challenging Economic Times?"
UHY Advisors and Level One Bank, January 2012.

"Commercial Damages in Complex Litigation"
Illinois Institute of Continuing Legal Education, October 2007.

"Future of Business Valuation"
PKF Continuing Professional Education Seminar, Santa Fe, New Mexico, July 2008.

"Michigan Tax Climate and the Economy"
IPT and the Michigan Department of Treasury, Taylor Michigan, April 2008.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 16*

## Selected Speeches, Lectures, Presentations & Seminars

"The Talent Nexus: Presenting the 2015 URC Report," Mackinac Island, Michigan, at the 2015 Detroit Chamber of Commerce annual conference (with presidents of University of Michigan, Michigan State University, and Wayne State University), forthcoming, May 2015.

"Value of Legal Cannabis Businesses in an Emerging U.S. Market," presentation to International Conference of the National Association of Forensic Economists, Amsterdam, Netherlands, forthcoming May 2015.

"The Business Tax Burden in Michigan," Presentation to the Michigan House of Representatives Appropriation Committee, April 2015.

"Proving Injury and Estimating Damages Caused by Changes in Dealership Sales Territory," presentation to the National Association of Dealer Counsel annual meeting, Laguna, California, April 2015.

"Opportunities & Challenges in a Rebounding Economic Climate,"
2015 Business Symposium, sponsored by West Shore Bank, Scotville Michigan, April 2015.

"Using Recursive Methods for Estimating Commercial Damages: Three Case Studies," presentation at the NAFE sessions at the ASSA annual conference, Boston MA, January 2015 (with Jeff Johnson and Walter McManus).

"Michigan's Economy and the Future,"
Michigan Community Banker Association annual meeting, Traverse City, September, 2014.

"Innovating for the Blue Economy: Water Research at the URC"
Multiple media presentations at the Detroit Regional Chamber Policy Conference, Mackinac Island, Michigan, May 2014, with Mary Sue Coleman, president of University of Michigan, Lou Anna K. Simon, president of Michigan State University, and M. Roy Wilson, president of Wayne State University.

"Dealerships and Disparate Impact Claims"
Presented at the National Association of Dealer Counsel Annual Member Conference, Palm Beach, Florida, April 2014, with Scott Watkins and Robert Y. Weller II, Abbott Nicholson PC.

"Automation Alley's Technology Industry Outlook"
Presented at the Automation Alley 2014 Technology Industry Outlook Luncheon, Troy, Michigan, March 2014.

"Policy Uncertainty and Persistent Unemployment: Numerical Results from a New Approach"
Presented to the National Economists Club, Washington, D.C., February 6, 2014.

"The Economic Footprint of Michigan's Fifteen Public Universities"
Prepared for Presidents Council, State Universities of Michigan, Lansing, Michigan; presented December 10, 2013, with Samantha Superstine.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 17*

"Estimating Value and Damages for Start-up Firms: Lessons from a Case Study"
Presented at the Illinois Economic Association 2013 Annual Meeting, Chicago, Illinois, October 2013, with William Pearson.

"Persistent Unemployment and Policy Cost Uncertainty"
Edmund A. Mennis contributed paper award presentation, Annual Meeting of the National Association for Business Economics, San Francisco, California, September 2013.

"Highlights of the 2013 URC Report on Embracing Entrepreneurship"
Multiple presentations at the Detroit Regional Chamber Policy Conference, Mackinac Island, Michigan, May 2013, with Mary Sue Coleman, president of University of Michigan; Lou Anna K. Simon, president of Michigan State University; and Debbie Dingell, chair of Board of Governors, Wayne State University.

"The Technology Industry in Southeastern Michigan: Results of the Annual Technology Benchmarking Study"
Presented to members and news media, Automation Alley, Troy, Michigan, February 2012.

"Automotive Franchise Issues: Sales Effectiveness Metrics"
Presented to the Michigan Automobile Dealers Association, December 5, 2012, with Scott Watkins.

"Contributions of the University Research Corridor to the Auto Industry"
Opening address for Auto Industry Summit broadcast event, Troy, Michigan, June 14, 2012.

"Opportunities for Trade Between Michigan and Turkey"
Closing address for Turkey-Michigan Forum, Istanbul, Turkey, June 6, 2012.

"Highlights of the 2012 URC Report on the Auto Industry"
Multiple presentations at the Detroit Regional Chamber Policy Conference, Mackinac Island, Michigan, May 2012, with Mary Sue Coleman, president of University of Michigan; Lou Anna K. Simon, president of Michigan State University; and Allan Gilmour, president of Wayne State University.

"Dealership Market Territories: What to Watch"
Presented to the National Association of Dealer Council annual conference, Phoenix, Arizona, May 2012, with Lauren Branneman.

"Economic Impact of Proposed MSU Facility for Rare Isotope Beams"
Testimony for the Michigan Senate Energy and Technology Committee, March 13, 2012.

"Opportunities in the United States Alcoholic Beverage Industry"
American Southeast Europe Chamber of Commerce Beverage Expo Conference, Chicago, Illinois, October 14, 2011.

"How Does Michigan Succeed in these Challenging Economic Times"
Grand Rapids Economic Club, September 26, 2011.

"Remembering September 11"
Michigan House of Representatives, 9-11 Memorial Service, September 8, 2011.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 18*

"Highlights of the 2011 University Research Corridor Report"
Multiple presentations at Greater Detroit Chamber Conference, Mackinac Island, Michigan, June 2011, with Mary Sue Coleman, president of University of Michigan; Lou Anna K. Simon, president of Michigan State University; and Allan Gilmour, president of Wayne State University.

"Real Options and Economic Damages"
National Association of Forensic Economists International Conference, Venice, Italy, May 26, 2011.

"Outline of the 'Headlee' Tax Limitation Amendment"
Presentation to the Michigan House of Representatives Oversight, Reform, and Ethics Committee, March 1, 2011.

"The Competitiveness of the Michigan Business Tax (MBT)"
Presentation to the Michigan House of Representatives Tax Policy Committee, February 16, 2011.

"Transforming Automotive Industry: Implications for Global Markets"
Hong Kong Trade Development Council session at the SAE World Congress, Detroit, Michigan, April 14, 2010.

"Thinking Beyond the Current Crisis"
Presentation to the State of Michigan Board of Education, October 2009.

"State Budgets and the Economic Recession: Where do we Stand?"
Big Ten Conference, Lansing, Michigan, October 2009.

"Economic Outlook for Mid-Michigan"
Mount Pleasant Chamber of Commerce Economic Outlook Luncheon, September 2009.

"New Solutions for New Times: Economist Panel"
Michigan Conference on Affordable Housing, Lansing, Michigan, with Robert Kleine and Charles Ballard from Michigan State University, June 2009.

"Highlights of the 2009 University Research Corridor Report"
Multiple presentations at Greater Detroit Chamber Conference, Mackinac Island, Michigan, June 2009, with Mary Sue Coleman, president of University of Michigan; Lou Anna K. Simon, president of Michigan State University; and Jay Noren, president of Wayne State University.

"The Changing Michigan Economy"
MSAE Annual Conference, Lansing, Michigan, January 2009.

"A Dynamic Programming Approach to Estimating Commercial Damages when Real Options are Present"
Allied Social Science Association Conference, San Francisco, California, January 2009.

"Economic Benefits of the FRIB to Michigan"
Michigan FRIB Task Force meeting, East Lansing, Michigan, July 2008, with Lou Anna K. Simon, president of Michigan State University, and Carl Levin, US Senator from Michigan.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 19*

"Highlights of the 2008 University Research Corridor Report"
Press conference and related presentations at Greater Detroit Chamber Conference, Mackinac Island, Michigan, June 2008, with Mary Sue Coleman, president of University of Michigan; Lou Anna K. Simon, president of Michigan State University; and Jay Noren, president-elect of Wayne State University.

"Discount Rates and Reality: A Disconnect"
National Association of Forensic Economists International Conference, Istanbul, Turkey, May 2008, Conference Chair.

"Damages in Antitrust Cases"
Academy of Economics and Finance Conference, Nashville, Tennessee, February 2008, AEG working paper, with Ilhan Geckil and Theodore Bolema.

"Economic Impact of the University Research Corridor"
Greater Detroit Chamber Conference, Mackinac Island, Michigan, 2007, with Mary Sue Coleman, president of University of Michigan; Lou Anna K. Simon, president of Michigan State University; and Irvin D. Reid, president of Wayne State University.

"Estimating Antitrust Damages: Difficulties in the US and Europe"
Paper presented at the NAFE 4th International Conference, Barcelona, Spain, May 2007, Session Chair.

"Essential Factors in Business Valuation"
Paper presented at the Allied Social Science Association Conference, Chicago IL, January 2007, AEG working paper 2007-1, with Ilhan K. Geckil and Nicole Funari.

"Options for Business Tax Reform"
Town Hall Meeting on Tax Reform cosponsored by Michigan State University and The Center for Michigan, East Lansing, Michigan, November 2006.

"Three Lessons of Leadership"
Distinguished Alumni award speech, Detroit, Michigan, October 19, 2006.

"A Vision of Excellence for Michigan"
Future Forum, sponsored by the Michigan Chamber of Commerce, Traverse City, Michigan, September 2006.

"Revenue Trends in Midwestern States"
Midwest States Association of Tax Administrators Annual Conference, Traverse City, Michigan, August 21, 2006.

"Business Taxes and Options for the SBT Repeal"
KPMG Automotive Tax Share Forum, Dearborn, Michigan, June 22, 2006.

"Practical Use of Game Theory in Forensic Economics"
National Association of Forensic Economics International Conference, Florence, Italy, May 2006, Session Chair, AEG working paper 2006-6, with Ilhan K. Geckil.

"Competing for Jobs in a Global Economy"
Michigan Manufacturers Association CEO Forum, Lansing, Michigan, May 9, 2006.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 20*

"How Businesses and Taxpayers View the Single Business Tax"
Conference sponsored by MIRS news service and the Michigan Chamber of Commerce, Lansing, Michigan, April 12, 2006.

"Looking at the Future: Michigan's Economy and Real Estate"
Michigan Association of Realtors 2006 Broker Summit, Troy, Michigan, April 12, 2006.

"Options for Tax Reform"
Michigan House of Representatives, Tax Restructuring Committee, February 14, 2006.

"Lost Profits, Diminished Value, and Other Measures of Commercial Losses"
Southern Economic Association Conference, Washington, D.C., November 19, 2005.

"State of the Michigan Economy"
Detroit Regional Chamber Small Business Association Conference, Dearborn, Michigan, November 10, 2005.

"Practical Dynamic Programming for Business and Forensic Economics"
National Association of Forensic Economics International Conference, Dublin, Ireland, May 27, 2005, Session Chair.

"Tax Burdens of Michigan's Single Business Tax"
Michigan House and Senate Joint Tax Committee, May 25, 2005.

"Michigan Economic Overview"
Michigan Senate Finance Committee, March 2, 2005.

"Michigan Economic Overview"
Michigan House of Representatives Commerce Committee, February 15, 2005.

"The Economic Impact of Sporting Events"
Michigan Society of Association Executives, Lansing, Michigan, February 1, 2005.

"Pocketbook Issues and the Presidency"
Edmund A. Mennis Award Presentation at the National Association for Business Economics annual meeting, Philadelphia, Pennsylvania, October 4, 2004.

"Economics and Journalism"
National Center for Business Journalism at the American Press Institute, Detroit, Michigan, September 14, 2004.

"Pocketbook Issues and Presidential Elections"
Hauenstein Center for Presidential Studies at Grand Valley State University, Grand Rapids, Michigan, June 15, 2004.

"Countries, Tastes, and the Value of Beer Franchises in the US"
National Association of Forensic Economics International Conference, Edinburgh, Scotland, May 2004.

"Michigan's Tax Structure and Alternatives"
Michigan House-Senate Tax Working Group, April 21, 2004.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 21*

"Valuation and Damages for Franchised Businesses"
Allied Social Sciences Association annual meeting, San Diego, California, January 4, 2004, AEG working paper 2003-12; Similar presentation of revised paper, NAFE International Conference, Edinburgh, Scotland, May 2004, Session Chair.

"Market Conditions in the Affordable Housing Market"
Michigan Association of Housing Professionals, Lansing, Michigan, September 2003.

"Michigan Business Corporation Act Amendments: A Shareholders Rights Perspective"
Michigan House of Representatives Commerce Committee and the Michigan Senate Commerce Committee, June 2003.

"Real-world Productivity with Geographic Information Systems"
2002 e-Gov Conference, Washington, D.C., July 2002.

"Best Practices in Economic Development, North Carolina and Beyond"
North Carolina Summit on Workforce Development, Greensboro, North Carolina, February 27, 2002.

"The Citizen's Right to the Initiative Under the Michigan Constitution"
Michigan House of Representatives Election and Redistricting Committee, May 2001.

"Diversification in State and Local Economies"
Lecture for Michigan State University Extension council conference, Extension Councils: Building Community Capacity for Change; East Lansing, Michigan, September 2000.

"Trade Policy and the Reagan Administration"
Symposium on the Legacy of President Ronald Reagan, Southfield, Michigan, February 2000.

"The Headlee Amendment"
Lecture for Fiscal 101 series sponsored by Wayne State University, Lansing, Michigan, May 1999.

"The Effect of "Environmental Justice Policy on Business Decisions"
Guest lecture at the University of Michigan School of Natural Resources and the Environment, Ann Arbor, Michigan, March 1999.

"Modeling Competitive Strategies Under Different Economic Scenarios"
Annual meeting of the Society of Actuaries, New York, New York, October 1989.

"Cyclical Analysis of High-Yield Bond Portfolios"
Annual meeting of the National Association of Business Economists, San Francisco, California, September 1989.

"Challenges of Entrepreneurship Beyond the 1980's"
27th Annual Canadian-American Seminar, Windsor, Canada, November 1985.

"Forces of Free Trade"
26th Annual Canadian-American Seminar at the University of Windsor, November, 1984, also reprinted in Prospects for North American Trade Relations Beyond the 1980's, Ralph Cowan, editor, University of Windsor, 1985.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 22*

"Economic Policy and the Fight Against Poverty"
Council of Michigan Foundations seminar for nonprofit institutions, Lansing, Michigan, February 1985.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 23*

## Expert Reports

*Kathryn Qvale Exempt Trust, et al., v Qvale Trustees (re: Estate of Kjell Qvale)\**
Superior Court for the State of California, County of San Francisco (Probate Department), February 2015.

*Jack Daniels Audi vs. Audi of America,*
New Jersey Motor Vehicle Franchise Committee, October 2014.

*Francisco Marty, et al., vs. Anheuser-Bush Companies\**
U.S. District Court for the Southern District of Florida, June 2014.

*Globefill Incorporated v. Elements Spirits et al.\**
U.S. District Court for the Central District of California, September 2013.

*Owens-Brockway Glass Container Company v. State Tax Commission & City of Charlotte\**
Ingham County Circuit Court, State of Michigan, September 2012.

*County of Jackson v. City of Jackson\**
Court of Appeals, State of Michigan, August 2012.

*Glazer's Distributors of Illinois, Inc. v. NWS-Illinois, LLC, and National Wine & Spirts, Inc.\**
Cook County Circuit Court, 2012.

*David Peplinski, et al v. John Deere Renewables, et al\**
Huron County Circuit Court, December 2011.

*Bayway Auto Sales, Inc. v. Sonic Houston V LP and Sonic Momentum JVP LP\**
Texas Department of Motor Vehicles, July 2010.

*M.E. Fox, Jr., Plaintiff, v. M.E. Fox & Co., Inc., M.E. Fox, Sr., and Fox Revocable Trust, Defendants\**
Superior Court of the State of California, Santa Clara County, June 2010.

*Boardwalk Auto Center v. Chrysler Group LLC\**
Arbitration under federal law (section 747 of PL 111-117), May 2010.

*Phil Smith Chevrolet v. General Motors LLC\**
Arbitration under federal law (section 747 of PL 111-117), May 2010.

*Rogin Buick v. General Motors Company LLC*
Arbitration under federal law (section 747 of PL 111-117), May 2010.

*Bay Chevrolet v. General Motors Company LLC*
Arbitration under federal law (section 747 of PL 111-117), May 2010.

*Muller Realty v. Eastern Floral*
Kent County Circuit Court, April 2010 (concurring opinion).

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 24*

*InBev v. Haralambos*
Superior Court, State of California, January 2010.

*Alaska Rent-A-Car, Inc. v. Cendant Corporation, and Avis Rent-A-Car System, Inc., et al.\**
U.S. District Court, State of Alaska, October 2006, September 2009;
U.S. Court of Appeals for the Ninth Circuit, 2013.

*WHRJ, LLC v. City of Taylor\**
Arbitration of Contractual Obligation, June 2009.

*Warren Distributing Company, et al., vs. Inbev USA LLC and Anheuser Busch Inc.\**
U.S. District Court for the District of New Jersey, January 2009.

*DF Land v. Ann Arbor Township\**
Washtenaw County Circuit Court, July 2008.

*Oakland County v. Sheriff's Deputy Union\**
Act 312 Labor Arbitration, June 2008.

*Stout Tool Corp. v. Barry Kane, Miller Johnson Snell & Cummiskey\**
State of Michigan, Kent County Circuit Court, February 2008.

*Bonbright Distributors, Inc. v. InBev USA, et al.\**
Court of Common Pleas, Montgomery County, Ohio, June 2007.

*Dr. Larry Frydman v. Jon E. Hokanson, et al.\**
Court of Common Pleas, Lucas County, Ohio, April 2007.

*California Charley's Corporation, et al. v. City of Allen Park et al.*
Circuit Court for the County of Wayne, Michigan, February 2007\* [no report submitted.]

*Ohio Grocers Association, et al. v. Wilkins (State of Ohio)\**
Court of Common Pleas, Franklin County, Ohio, November 2006.

*Sound Beverage Distributors Inc. v. Heineken USA, Inc., and Pyramid Breweries, Inc.\**
Superior Court of Washington for King County, August 2006.

*Examination Management Services, Inc. v. Partners for Insurance, LLC*
U.S. District Court, Northern District of Texas, Dallas Division, February 2006.

*Galveston Beverage, Ltd. v. The Gambrinus Company\**
131st Judicial District Court, Bexar County, Texas, July 2005.

*Tri-County Wholesale Distributors, Inc. v. The Robert Mondavi Corporation, et al.*
Court of Common Pleas, Mahoning County, Ohio, April 2005.

*The Gambrinus Company v. Extrade S.A. de C.V., and Procermex, Inc.*
International Court of Arbitration of the International Chamber of Commerce, March 2005.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 25*

*ITT Automotive Electrical Systems v. State of Michigan, Dept. of Treasury*
State of Michigan, Court of Claims, July 2004.

*Alexander Ford -Mercury v. City of Franklin, Tennessee\**
State of Tennessee, Williamson County Chancery Court, November 2003.
(on remand to Franklin Board of Zoning Appeals)

*Labatt USA and Cerveceria Cuauhtemoc Moctezuma SA v. Montana Beverage Company\**
U.S. District Court, Western District of Texas, October 2003.

*Bonanza Beverage Co., Inc., v. Labatt, USA, LLC*
U.S. District Court, Clark County, Nevada, 2002.

*Mark Motors, Inc., v. Mercedes-Benz USA, LLC*
State of Illinois, Motor Vehicle Review Board, 2002.

*Williams Wholesalers v. Anheuser-Busch*
U.S. District Court, Southern District of Texas, 2002.

*NWS Distributors v. State of Michigan*
State of Michigan, Circuit Court for Ingham County, 2002;
Michigan Supreme Court, October 2006.

*Tamaroff Buick, Inc., v. American Honda Motor Company, Inc.,* and
*Sunshine Automotive, Inc., vs. American Honda Motor Company, Inc.*
U.S. District Court, Eastern District of Michigan, Southern Division, 2002.\*

*Mid-Continent Distributors v. W. Grant & Sons*
U.S. District Court for the Eastern District of Missouri, September 2001.

*Detroit Lions v. City of Pontiac*
State of Michigan, Circuit Court for the County of Oakland, 2001.

*Alpena Beverage Co. v. Labatt U.S.A., Inc.*
State of Michigan, Circuit Court for the County of Alpena, 2001.

*Siegel, Bush & Cheney v. LePore*
U.S. District Court, Southern District of Florida, 2000.

*American Special Risk v. Cities of Center Line, Eastpointe, Roseville, St. Clair Shores, and Warren\**
U.S. District Court, Eastern District of Michigan, 2000.

*City of Detroit v. Detroit Firefighters Association\**
Michigan Act 312 Labor Arbitration, 2000.

*City of Detroit v. Detroit Lieutenants & Sergeants Association\**
Michigan Act 312 Labor Arbitration, 1999.

*City of Detroit v. Detroit Public Officers Association\**
Michigan Act 312 Labor Arbitration, 1999.

Exhibit 1
*Patrick L. Anderson, Curriculum Vitae, page 26*

*Arnold Lincoln Mercury v. Ford Motor Company*
Ford Dealer Policy Board, 1998.

*Brighton Lincoln-Mercury v. Hines-Park Ford-Mercury*
Wayne Co. (Michigan) Circuit Court, 1998.
***sworn testimony given in deposition, trial, or hearing.**

*Updated May 2015*

*Copyright Notice*

(c) 2010, 2011, 2012, 2013, 2014, 2015 Anderson Economic Group LLC. All rights reserved except use by clients of AEG within the scope of an engagement, or for use permitted under Federal Rules of Civil Procedure or applicable state rules by parties to a case in which the subject of this CV has been disclosed as an expert.

No derivative use, commercial use, postings on web sites, or re-distribution permitted.

# Ilhan K. Geckil

Anderson Economic Group, LLC
Curriculum Vitae

## EMPLOYMENT

| | |
|---|---|
| 2001 to Present | **Anderson Economic Group, LLC\*** |
| | East Lansing \| Chicago \| Istanbul |

*Director of Business Valuation and Strategy*
*Senior Consultant - Economist*

- Manage AEG's Corporate Finance and Valuation Practice Area
- Manage projects on corporate finance advisory; business valuation; commercial damages and lost profits; economic and financial analyses and modeling; risk assessment; and market evaluation
- Provide mergers and acquisitions advisory services
- Provide strategy and management consulting
- Analyze financial, economic, sales, operational, and legal aspects of organizations
- Prepare financial projections for business entities by analyzing the subject company, product portfolio, industry, market, and competitive environment
- Specialize in automotive, hotel, beer, wine and spirits, franchise, and retail industries
- Provide expert testimony services

| | |
|---|---|
| 1999 to 2001 | **Michigan State University** |
| | East Lansing, Michigan |

*Teaching Assistant: Microeconomics (Fall 1999); Macroeconomics (Spring 2000)*
*Research Assistant to Dr. Warren J. Samuel (Fall 2000)*

| | |
|---|---|
| 1998 to 1999 | **PDF Corporate Finance\*\*** |
| | Istanbul, Turkey |

*Analyst*

## EDUCATION

| | |
|---|---|
| 1999 to 2001 | **Michigan State University - Eli Broad Graduate School of Management** |
| | East Lansing, Michigan |
| | *M.A. in Economics* |
| 1994 to 1999 | **Koç University** |
| | Istanbul, Turkey |
| | *B.A. in Economics* |

## PUBLISHED BOOKS AND ARTICLES

- *Applied Game Theory and Strategic Behavior,* Chapman Hall/CRC Press, Jul 2009, with Patrick L. Anderson

---

*\* Anderson Economic Group was a division of BBK, Ltd. between 2001 and June 2002. BBK is a consulting firm which specializes in turnaround management, corporate finance, operations, and strategy.*
*\*\* PDF Corporate Finance is a consulting firm which specializes in corporate finance, and mergers and acquisitions.*

- *Pocketbook Predictions of Presidential Elections*, Business Economics, The Journal of the National Association for Business Economics, Oct 2004, with Patrick L. Anderson Winner of *Edmund A. Mennis Contributed Paper Award* of the National Association for Business Economics in 2004
- *Competitive Response to Corporate Average Fuel Economy Standards*, Business Economics, The Journal of National Association for Business Economics, April 2003

## WORKING AND RESEARCH PAPERS

- *Damages in Antitrust Cases*, prepared for the Academy of Economics and Finance's 35th Annual Conference in Nashville, Tennessee, February 15, 2008 (with Patrick L. Anderson, and Theodore R. Bolema)
- *Business Valuation and the IRS: Revenue Ruling 59-60*, prepared for the Academy of Legal Studies in Business Conference in Indianapolis, Indiana, August 11-14, 2007 (with Patrick W. Fitzgerald, William G. Timothy Mahon and Konrad S. Lee)
- *Practical Use of Game Theory in Forensic Economics*, also presented at National Association of Forensic Economics International Conference, Florence, Italy, May 2006 (with Patrick L. Anderson)
- *Lost Profits, Diminished Value, and Other Measures of Commercial Losses*, Anderson Economic Group, November 2005 (with Patrick L. Anderson)
- *Countries, Tastes, and the Value of Beer Franchises in the United States*, The International Conference of the National Association of Forensic Economics, Edinburgh, Scotland, June 2004 (with Patrick L. Anderson)

## PRESENTATIONS AND SPEECHES

- *Automotive Franchise Issues: Sales Effectiveness Metrics*, Idaho Automobile Dealers Association, Coeur d'Alene, Idaho, June 16, 2014
- *Southeast Europe Series: Turkey – Overview of the Turkish Economy*, American Southeastern Europe Chamber of Commerce, Chicago, Illinois, November 5, 2013
- *Overview of Turkish, U.S., and Michigan Economies; Automotive Industry and Opportunities*, Turkey-Michigan Forum, Istanbul, Turkey, June 5, 2012
- *The Wine Industry in the U.S.: Structure, Scale, Trends, and Opportunities*, Wines of Macedonia, Invest Macedonia, Chicago, Illinois, May 1, 2012
- *The Transforming Automotive Industry in the U.S. and Implications to the Global Market*, Chicago International Trade Commissioners Association, Chicago, IL, February 3, 2010 (with Scott D. Watkins)
- *The Value of Forensic Economics Practices with Concentration in Valuation,* National Association of Forensic Economics, Istanbul, Turkey, May 2008
- *Essential Factors in Business Valuation and Commercial Damages*, ASSA Conference in Chicago, IL, January 5-7, 2007 (with Patrick L. Anderson and Nicole Funari)
- *Pocketbook Predictions for Presidential Elections,* Seidman School of Business Alumni Association and the Hauenstein Center for Presidential Studies at Grand Valley State University, Grand Rapids, Michigan, June 2004
- *The Automotive Industry in Turkey,* U.S. Department of Commerce, Export Division, Grand Rapids, Michigan, May 2004

## EXPERT REPORTS

- Brentlinger Enterprises d/b/a MAG Volvo of Dublin v. Volvo Cars of North America *Damages Analysis ,*United States District Court Southern District of Ohio, April 2015.
- Francisco Rene Marty, Seth Goldman, and Fernando Marquet v. Anheuser-Busch Companies, LLC
  *Expert Report: Damages Issues for Class Certification,* United States District Court Southern District of Florida, June 2014.
- Auburn Valley Mazda v. Mazda Motor of America
  *Damages Analysis: Lost Profits Due to the Termination of Mazda Franchise of Auburn Valley Mazda*, October 2012.

- Hanson Volkswagen, Inc. v. Volkswagen of America, Inc.
  *Analysis of Hanson Volkswagen's Market Area and Assessment of Volkswagen Performance in the Market,* State of Washington Office of Administrative Hearings for the Department of Licensing, September 2012.
- Superior Pontiac Buick GMC Inc., Superior Nissan v. Nissan North America, Inc.***
  *Market Evaluation and Performance Analysis for Superior Nissan,* U.S. District Court, Eastern District of Michigan, Southern Division, June 2010.
  [Testified in Court for this case.]
- Tysinger Motor Co., Inc. v. Chrysler LLC***
  *Economic Interests of the Public, Dealer, and Manufacturer: Tysinger Dodge,* AAA Arbitration under federal law (section 747 of PL 111-117), June 2010.
- *Business Appraisal of Neil J. Bueker, D.D.S.,* July 2009.
- Gale Corp. v. Greenberg Traurig, LLP
  *Damages Analysis,* U.S. District Court, Eastern District of California, April 2009.
- Alaska Rent-A-Car, Inc. v. Cendant Corporation, Avis Rent-A-Car System, Inc., et al.
  *Damages Analysis: Breach of Agency Settlement Agreement,* U.S. District Court, State of Alaska, February 2009.
- Warren Distributing Company, et al., v. Inbev USA LLC and Anheuser Busch Inc.
  *Report on Terminated New Jersey Wholesalers*, United States District Court for the District of New Jersey, January 2009.
- Leong Sing Lye v. Harbin Electric, Inc.
  *Valuation Analysis: Harbin Stocks*, United States District Court for the District of Nevada, September 2007.
- Bonbright Distributors, Inc. v. InBev USA, et al.
  *Diminished Value and Damages Analysis*, Court of Common Pleas, Montgomery County, Ohio, June 2007.
- Sound Beverage Distributors Inc. v. Heineken USA, Inc., and Pyramid Breweries, Inc.
  *Valuation Analysis of Heineken/FEMSA Distribution Rights*, Superior Court of Washington for King County, August 2006.
- Zip, Inc., and Bronken's Good Time Company v. The Wine Group, Inc., Diageo North America, Inc., and Columbia Distributing Company
  *Franchise and Damage Analysis of Bronken's Good Time Company and Zip, Inc.,* The United States District Court for the District of Montana, July 2005.
- Tri-County Wholesale Distributors, Inc. v. The Robert Mondavi Corp., et al.***
  *Diminished Value and Damages Analysis for Tri County Wholesale Distributors, Inc.,* Court of Common Pleas, Mahoning County, Ohio, April 2005.
  [Testified in Court for this case.]
- The Gambrinus Company v. Extrade S.A. de C.V., and Procermex, Inc.
  *Business Incentives and Objectives for Grupo Modelo and Gambrinus in 1996,* International Court of Arbitration of International Chamber of Commerce, March 2005.

## PROFESSIONAL AFFILIATIONS

- The Institute of Business Appraisers, Member since 2004
- National Association for Business Economics, Member since 2001
- Round Table Group, Member since 2008
- American Southeast Europe Chamber of Commerce, Treasurer, since 2010
- Chicago Council on Global Affairs,  since 2013
- Association for Corporate Growth, since 2015

## HONORS AND AWARDS

- Edmund A. Mennis Best Contributed Paper Award of the National Association for Business Economics, September 2004
- Koç University Leadership Award, Class of 1999, June 1999 (elected President of the Student Senate, 1998-1999)
- Fellowship, Koç University, Fall 1994 through Spring 1999

*** *sworn testimony given.*

*September 11, 2015*

*Exhibit 2. Representative Clients of Anderson Economic Group*

# Representative Client List of Anderson Economic Group

## Businesses

- Wholesalers representing:
  - Anheuser-Busch
  - Beck's
  - Coors
  - Heineken
  - Labatt
  - Miller
  - Molson
  - and Mondavi brands
- Beck's North America
- Diageo North America, Inc.
- Heineken USA
- InBev USA
- Labatt USA
- National Wine & Spirits
- William Grant & Sons
- AT&T
- BorgWarner
- DaimlerChrysler
- Delphi Corporation
- Detroit Lions
- First Merit Bank
- Ford Motor Company
- The Gambrinus Company
- General Motors Corporation
- Honda North America
- Innkeepers USA
- ITC Holdings Corp.
- ITT Automotive
- Johnson Controls
- Lithia Motors, Inc.
- Lockwood Development
- Meijer, Inc.
- Michigan Motion Pictures, Inc.
- Nestle Waters North America
- Palace Sports & Entertainment
- PBR Knoxville, LLC
- PG&E Generating
- Raleigh Studios
- Rock Ventures
- SMG
- Soave Enterprises
- Spartan Stores
- The Taubman Company
- Visteon
- Auto dealers representing BMW, Buick, Cadillac, Chevrolet, Chrysler, Dodge, Ford, GMC, Harley-Davidson, Honda, Hyundai, Jeep, Kia, Mercedes-Benz, Nissan, Subaru, Suzuki, Toyota, and Volkswagen brands

## Governments

- U.S. Department of Commerce
- Province of Ontario, Canada
- Commonwealth of Kentucky
- State of Michigan
- State of North Carolina
- State of Ohio
- State of Wisconsin
- Cass County, Michigan
- Collier County, Florida
- Oakland County, Michigan
- Wayne County, Michigan
- City of Cincinnati, Ohio
- City of Detroit, Michigan
- City of Hamtramck, Michigan
- City of Lansing, Michigan
- City of Sandusky, Ohio
- Detroit-Wayne County Port Authority
- Experience Grand Rapids
- Kent County Convention & Arenas Authority
- Lansing Economic Area Partnership
- Bloomfield Hills School District
- University of Detroit Jesuit High School

## Nonprofit and Trade Organizations

- Automation Alley
- Beaumont Hospitals
- Blue Cross Blue Shield
- Business Leaders for Michigan
- Ferris State University
- Grand Rapids Area Chamber of Commerce
- Greater Lansing Convention & Visitors Bureau
- Greater Naples Chamber of Commerce
- International Mass Retailers Association
- The Mackinac Center for Public Policy
- McClaren Healthcare Corporation
- Michigan Chamber of Commerce
- Michigan Economic Development Corporation
- Michigan Manufacturers Association
- Michigan Retailers Association
- Michigan State University
- National Education Association
- The Nature Conservancy
- Oakland University
- Project Management Institute
- Pulse Canada
- Telecommunication Association of Michigan
- University of Chicago
- University of Michigan
- University Research Corridor
- Van Andel Institute
- Walsh College
- Wayne State University
- West Virginia High-Tech Consortium



*September 11, 2015*

*Exhibit 3. Statement of Ethical Principle and Tenets of Practice*

Exhibit 3

## Statement of Ethical Principles and Principles of Professional Practice
## National Association of Forensic Economics (NAFE)

When providing expert opinion for use as evidence by the trier of fact, a NAFE member pledges, as a condition of membership, adherence to the following:

**1. Engagement**

Practitioners of forensic economics should decline involvement in any litigation when they are asked to assume invalid representations of fact or alter their methodologies without foundation or compelling analytical reason.

**2. Compensation**

Practitioners of forensic economics should not accept contingency fee arrangements, or fee amounts associated with the size of a court award or out-of-court settlement.

**3. Diligence**

Practitioners of forensic economics should employ generally accepted and/or theoretically sound economic methodologies based on reliable economic data. Practitioners of forensic economics should attempt to provide accurate, fair and reasonable expert opinions, recognizing that it is not the responsibility of the practitioner to verify the accuracy or completeness of the case-specific information that has been provided.

**4. Disclosure**

Practitioners of forensic economics should stand ready to provide sufficient detail to allow repli-cation of all numerical calculations, with reasonable effort, by other competent forensic econom-ics experts, and be prepared to provide sufficient disclosure of sources of information and assumptions underpinning their opinions to make them understandable to others.

**5. Consistency**

While it is recognized that practitioners of forensic economics may be given a different assign-ment when engaged on behalf of the plaintiff than when engaged on behalf of the defense, for any given assignment, the basic assumptions, sources, and methods should not change regardless of the party who engages the expert to perform the assignment. There should be no change in meth-odology for purposes of favoring any party's claim. This requirement of consistency is not meant to preclude methodological changes as new knowledge evolves, nor is it meant to preclude per-forming requested calculations based upon a hypothetical--as long as its hypothetical nature is clearly disclosed in the expert's report and testimony.

**6. Knowledge**

Practitioners of forensic economics should strive to maintain a current knowledge base of their discipline.

**7. Discourse**

Open, uninhibited discussion is a desired educational feature of academic and professional foren-sic economic conferences. Therefore, to preserve and protect the educational environment, practi-tioners of forensic economics will refrain from the citation of oral remarks made in an educational

Exhibit 3

environment, without permission from the speaker.

## 8. Responsibility

Practitioners of forensic economics are encouraged to make known the existence of, and their adherence to, these principles to those retaining them to perform economic analyses and to other participants in litigation. In addition, it is appropriate for practitioners of forensic economics to offer criticisms of breaches of these principles.

*September 11, 2015*

*Exhibit 4. Industry Data*

*September 10, 2015*

## EXHIBIT 4.1 - INDUSTRY BRIEF: THE ECONOMIC STRUCTURE OF THE U.S. ALCOHOLIC BEVERAGE INDUSTRY

by Patrick L. Anderson
Principal & CEO, Anderson Economic Group LLC

### Preface

*This industry brief describes the unique economic structure of the alcoholic beverage industry in the United States. It is based on extensive industry research over the last decade and a half by the consultants at Anderson Economic Group, including work for retailers, wholesalers, domestic suppliers, and importers of wine, beer, and spirits.*

*This industry brief is not intended as investment advice or as a legal opinion on any specific company or controversy.*

### UNIQUE ECONOMIC STRUCTURE; IMPORTANCE TO VALUATION AND DAMAGES

The alcoholic beverage industry has a unique position in the U.S. economy, by virtue of the intense battles fought over it in the twentieth century. The introduction of Prohibition, then its repeal with the XXI amendment, and the resulting state regulation of the industry, create a unique economic structure.

The value of any business is dependent on its ability to prosper in the specific market and industry in which it operates. Thus, to estimate the value of a firm, or to estimate economic damages a firm has suffered, it is essential to analyze the market, industry, and economy in which the firm operates. The importance of proper economic and industry research to valuation is recognized by both valuation authorities and tax authorities.[1]

Fundamental valuation, market, and business strategy tasks require an understanding of the unique economic structure and history of this industry. These include:

- How manufacturers, distributors, and retailers make money, each operating within a limited "tier" of the industry;
- The relationship between the manufacturer, the distributor, the retailer, and the eventual consumer;

---

1. Among valuation authorities, see, e.g., Patrick Gaughan, *Measuring Business Interruption Losses and Other Commercial Damages* (Wiley, 2009), Patrick Anderson, *Economics of Business Valuation* (Stanford University Press, 2013). The seminal IRS Revenue Ruling 59-60 (1959) explicitly requires an economic analysis of the relevant industry. This requirement has subsequently been incorporated into many other valuation standards. See, e.g., Appraisal Foundation, USPAP (2008).

- Reasonable business practices in the industry, given the position of the manufacturer and distributor within the three tier system;
- The essential drivers of business valuation (and, similarly, the potential economic damages from an interruption of the business) within the economic structure of the industry.

  These include: the growth prospects for brands; the demographics and other indicators of demand in the market; the potential for competition in the relevant market; the likely profit margins; the ability to transfer ownership interests; the importance of licenses, franchises, or brands; and the outlook for the industry as a whole.

## PROHIBITION AND THE XXI AMENDMENT

Below, we review briefly the key historical events that created the economic structure of the industry and the use of the "three tier" system.

The XXI Amendment to the United States Constitution, which ended Prohibition, provides great latitude to states in regulating their markets for spirits, including beer and malt beverages. The first section of the Amendment repealed the Eighteenth Amendment, which established Prohibition. The second section consists of the following sentence:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

The XXI amendment to the U.S. Constitution, ratified in 1933, allowed states to determine for themselves how to structure their industry, within their borders. The amendment allowed States to (a) determine whether they wished to remain "dry," and (b) restrict and regulate the "transportation or importation" of alcoholic beverages, if they wished to allow such beverages to be sold in their states.

## ECONOMIC STRUCTURE OF THE THREE TIER SYSTEMS

Almost all states established, by law, a "three tier" system after the XXI Amendment was ratified.[2] These systems separate suppliers (also called "importers" and "manufacturers") from the distributors, and from retailers, of alcoholic beverages. Under a three tier system, suppliers are obligated to sell to distributors. Distributors are, in turn, obligated to sell to retailers. Only retailers can sell to individual consumers.

---

2. Many sources, including multiple beer and wine distributor associations and associations of suppliers, consider all states to have "three tier" systems. The U.S. Supreme Court, in *Granholm v Heald* (544 U.S. 460, no. 03-1116, May 2005), stated that "most" states have such a system. The Federal Trade Commission, in a report on interstate commerce in wine, similarly reports that "most" wine is distributed through a three tier system, and that "most states prohibit vertical integration between the tiers."

Such a structure is highly unusual, if not unique, among industries in the United States. In particular:

- In most industries, manufacturers can sell directly to consumers, or sell to retailers that sell to consumers; in many industries, some manufacturers sell directly and others sell through middlemen at the same time.[3]

- In most industries, prices are set largely by competition, without any state-established lists, monopoly arrangements, or restrictions on changes in prices.[4]

- In many industries, brand identification of the product is not nearly as important as in the alcoholic beverage industry.[5] Among alcoholic beverages, the brand identity—often established nationally or regionally through heavy advertising and promotion—can be a dominant factor.[6]

There were particular reasons why the U.S. Constitution, and the constitutions and laws of so many states, allows for such an unusual economic structure.

### Purposes of Three Tier Systems

The original purposes of three tier systems were grounded in the Prohibition-era concerns about the dangers of overconsumption of alcoholic beverages; the risks of corruption, crime, and tax evasion; the abuses that occurred in "tied-house" retailers dominated by brewers; and the need for government to tightly regulate the industry.

---

3. For example, consider the personal computer industry. Among industry leaders, Dell started its business selling almost exclusively through a direct channel to consumers. IBM, which started the industry, used to sell through distributors and retailers. Later, it sold directly to consumers; still later it sold its entire consumer PC business to another firm. Apple sells both direct and through retail stores. In addition, a large share of the industry consists of small stores that manufacture and sell to the consumer.
   Consider also the oil and gas industry, where the "manufacturer" role involves some importing, purchasing and selling at the wholesale level, and then processing (refining), before distributing to retailers (e.g. service stations) or consumers (including large utilities). Some large companies may play intermediate roles (such as brokers and transporters, including pipeline and shipping companies), as well as numerous other auxiliary segments (such as exploration, drilling, and other specialized firms). These may exist in numerous combinations, with some large oil companies including the function within their company, and others contracting for the service.

4. Within the alcoholic beverage industry, the beer segment generally involves more price competition than the spirits segment.

5. Brand plays a major role in many goods sectors of the economy (such as automobiles, electronics, and direct-sales computers), though not all. It plays much less of a role in the service sector, which represents over half of the U.S. economy.

6. This is particularly the case for beer, as evidenced by the enormous sums spent on advertising by the major brewers, and on the importance placed on distributor promotion and marketing efforts in the distribution agreements between brewers and distributors. High-end and mid-market spirits, and some brands of wine, also have important brand identities.

States therefore were willing to impose an economic structure on the industry designed primarily to promote temperance and collect tax revenue.[7]

*The Commerce Clause; Interstate Commerce; and the Industry*

The XXI Amendment was written to allow a nearly untrammeled ability of states to regulate the industry within their borders.[8] In other industries, the Constitution's protection of interstate commerce, the U.S. government's anti-trust laws, and other provisions of law and Constitution would have prevented state governments from interfering in commerce to such an extent.[9]

For decades following the adoption of the amendment, states were allowed nearly untrammeled authority in regulating their own industry, and the commerce into their states to supply that industry.[10] However, in recent decades, courts began recognizing limits to state authority under the XXI Amendment, particularly in the area of interstate commerce.[11]

However contentious the issue of *interstate* commerce and state regulation is, the constitutionality of the three tier system *within* a state's borders is generally

---

7. These goals of temperance and the collection of taxes are regularly weighed by Courts when reviewing challenges to state laws, including those cited below; arrayed against them are typically goals of increasing consumer choice, allowing free trade, and other arguments of economic efficiency.

8. The XXI amendment was adopted in 1933. Its scope was tested quickly in *State Board of Equalization of California v Young's Market,* 299 U.S. 59, 57 S. Ct. 77 (1936), in which the Supreme Court acknowledged that a protectionist California statute would have violated the Commerce and Equal Protection clauses of the U.S. Constitution, but ruled that since the adoption of the XXI amendment, states could regulate the importation of alcoholic beverages without being restricted by the Commerce Clause.

9. Practices that are established by state law in the alcoholic beverage industry—but might be prohibited in other industries—include establishing state monopolies, restricting importation across state lines, preventing commercial arrangements between manufacturers/importers, distributors, and consumers from developing as those parties saw fit, and imposing a three-tier system. Both sets of opinions in the Supreme Court's recent decision in *Granholm v Heald,* 544 U.S. 460 (May 2005) note this difference.

10. The Court, in *California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 110 (1980) summarized this as follows:

"The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system. Although States retain substantial discretion to establish other liquor regulations, those controls may be subject to the federal commerce power in appropriate situations."

The *Midcal* case involved a price-fixing arrangement supervised by the State of California, and is often considered an antitrust case rather than an alcoholic beverage case. The Court affirmed the California Court of Appeals in finding "that the Twenty-first Amendment provides no shelter for violation of the Sherman Act caused by the State's wine pricing program."

accepted.[12] Thus, the three tier economic structure is a fundamental backdrop for business valuation and damages estimation in the industry.[13]

## DISTRIBUTION ARRANGEMENTS IN THE INDUSTRY

Given the three tier system, the distribution arrangements in the industry require contractual agreements among suppliers, distributors, and retailers. These have many common elements, although there is some variation by state and by type of beverage.

The dominant form of business organization in this industry is that of locally-based franchised distributors operating under agreement with a much smaller number of suppliers. The manufacturer/supplier produces different kinds of products which they brand differently, and often advertise nationally or regionally. The individual distributors are given the rights to distribute these branded products in specific geographic areas. That specific market area might be a county or an entire state. Depending on the type of beverage and the state, the distribution agreements may provide for exclusive representation in the area.

There are a number of causes for this form of organization:

1.  The forcible separation of the manufacturer, distributor, and retailer in the industry;

---

11. The modern turning point was *Hostetter v Idlewild*, 377 U.S. 324, 84 S. Ct. 1293 (1964), where the U.S. Supreme Court ruled that the Commerce Clause of the U.S. Constitution must be read together with the XXI amendment, and therefore New York could not prohibit passengers on international flights from transporting alcoholic beverages outside the country. A more recent case is *Bacchus Imports v Dias*, 468 U.S. 573, 104 S. Ct. 2440 (1984).

    The Court has also limited the ability of states to apply their alcoholic beverage regulations in an extra-territorial manner, as in *Brown-Forman Distillers v. NY Liquor Authority*, 476 U.S. 573 (1986) involving a New York law that affected behavior in other states, and *Healy v. The Beer Institute*, 491 U.S. 324 (1989) regarding a similar application of Connecticut law to activities outside that state.

    The U.S. Supreme Court's recent decision in *Granholm v Heald* 544 U.S. 460 (May 2005) further underlines the limits of state authority to enact laws that discriminate against out-of-state firms.

12. This is evidenced by the fact that, even in the recent decisions cited above, only the offending provisions of state law were singled out, and the general three tier system was left completely intact. The Court explicitly affirmed state three tier systems in *North Dakota v. US*, 495 U.S. 423 (1990) when they are created in the interests of "promoting temperance, ensuring orderly market conditions, and raising revenue."

13. This structure, with particular focus on wine, was also recently described in Barbara Insel, "The US Wine Industry," *Business Economics*, vol. 43 no. 1 (January 2008).

    The economic structure with particular emphasis on beer suppliers is covered in Douglas Greer, "Beer," Industry Studies, 2d ed., M.E. Sharpe, 1998; and Ken Elzinga, "Beer," in Industry Studies, 10th ed. Prentice-Hall, 2001. Note that the competitive structure among suppliers in the beer market has changed somewhat since the publication of these chapters.

**2.** The importance of image and brand in consumer purchase decisions about alcoholic beverages;

**3.** The relatively high cost of distributing beverages across large geographic areas, providing an incentive for a small number of distributors to service a large number of brands in each geographic area; and

**4.** The capital-intensive nature of manufacturing the products, which encourages large facilities run by manufacturers that ship the product to wholesalers across the country.

## TYPES OF DISTRIBUTION AGREEMENTS

The type of distribution agreement between the parties depends on the state, type of beverage, and the business goals of the manufacturer and distributor. In economic terms, many of the agreements between manufacturers and distributors fall into two classes: distribution appointment agreements and franchise agreements.[14]

**1.** Distribution appointment agreements (often called simply "distribution agreements") involve the designation by a manufacturer of a distributor, for certain products, and within a certain area. Other provisions of the agreement include sales efforts and standards for the storage and distribution of the product. Depending on the state laws, the manner in which the product is priced is also covered by the agreements. If the appointment is "exclusive," then the manufacturer agrees not to provide product (often with some exceptions) to other distributors in the area, and requires the distributor to respect the appointments of distributor in other areas.

**2.** The other type of arrangement is better characterized as a franchise agreement. The essence of a franchise is three elements: a trademark established by the franchisor, which the franchisee uses in its business; a fee paid by the franchisee for the assistance of the franchisor and use of the trademark; and substantial control over the franchisees operations by the franchisor.[15] In this industry, the key elements are the use of the nationally-established brands, the assistance of the manufacturer in promoting the brands, and the required payments to the benefit of

---

14. We note here that there may be statutory and contractual issues about whether a specific contract is a "franchise" or "exclusive appointment" agreement. This discussion focuses on the economics of the business arrangements, rather than the legal interpretation of any specific contract.

 Franchising and alternatives to franchises are described in Barbara Beshel, *Introduction to Franchising,* IFA Educational Foundation, 2001; found on the International Franchising Association website at http://www.franchise.org.

15. See, e.g., Roger Blair and Francine Lafontaine, *Economics of Franchising,* Cambridge 2005, chapter 1. Valuation and damages for franchised businesses are discussed in Patrick Anderson "New Developments in Business Valuation," in *Litigation Economics,* Elsevier, 2005, as well as in *Economics of Business Valuation,* Stanford University Press, 2013.

 In the U.S., the FTC franchise rule (1978; revised 2007), at 16 C.F.R. Part 436, codifies the three-element test. The FTC describes the rule on its website at: http://www.ftc.gov/bcp/franchise/netrule.shtm. The 2007 revision was published in the *Federal Register* vol. 72 no. 61, on March 30, 2007.

the manufacturer (which may include required advertising expenses), and the control of certain aspects of the franchisee's business, including sales efforts and product quality standards.

Franchises involve a greater degree of control than appointment agreements, and are more common for beer distribution agreements. For spirits, appointment agreements are more common. Wine varies greatly, although appointments appear to be more common.

### VARIATIONS AMONG STATES; DIFFERENCES IN PRODUCTS

Although the three tier structure has been adopted almost uniformly across the United States, there is much variation in its implementation among the various types of alcoholic beverages.

Beer has the most consistent regulatory structure across the states. Typically, states will have a large number of beer distributors, each with a local responsibility to distribute specific brands. Spirits, on the other hand, are often distributed by a much smaller number of distributors or distribution agents for the state. Wine distribution laws vary widely across the states. In some states, "direct shipping" of wines to adult consumers is allowed; in others, it is prohibited.

There are also differences among the states in the degree of regulatory control. Some states are considered "control" states because they have a monopoly on the wholesaling or retailing of certain alcoholic beverages. In these states, the government itself is part of the distribution system. Approximately one fourth of the U.S. population lives in a control state. As of May 2014, 17 states and two Maryland counties are considered control jurisdictions.[16] Other states, while regulating alcoholic beverage businesses extensively, do not actually control the business themselves.

*Copyright Notice*

This section contains copyrighted material. Do not reproduce, post on a web site, or otherwise redistribute. All contents (c) 2010, 2012, 2013, 2014 Anderson Economic Group LLC. The author makes no copyright claim to government works.

---

16. The National Alcoholic Beverage Control Association maintains a list of control jurisdictions. National Alcohol Beverage Control Association, "Control State Data Matrix," May 5, 2014, <http://www.nabca.org/assets/Docs/cs_info_05052014.pdf>, accessed June 2014.

**June 25, 2004**

**AEG Working Paper 2004-4**

# Countries, Tastes, and the Value of Beer Franchises in the United States

**Patrick L. Anderson, Principal**

**Ilhan Kubilay Geckil, Economist**

**Anderson Economic Group, LLC**

For presentation at:

The International Conference of

the National Association of Forensic Economists

Edinburgh, Scotland, June 25, 2004

(c) 2004 Anderson Economic Group LLC.
Rights for research purposes granted,
provided proper attribution given. All other rights reserved.

*Table of Contents*

**Table of Contents** ................................................................. **1**

Abstract ............................................................................. 1

A Brief History of the Beer Business ...................................... 1

The Beer Market in the United States .................................... 1

The Three Tier System ......................................................... 1

Segmentation of Beers By Type ............................................ 2
Taste in the American Market ................................................ 2
Price in the American Market ................................................ 2

The Value of Beer Franchises ............................................... 3
Determinant of Value 1: Volume ............................................ 3
Determinant of Value 2: Franchise and Brand ......................... 3
Discussion: Limits on Competition ......................................... 3

Brands and Market Share ..................................................... 4
Sales by Price Category ....................................................... 4
Sales by Major Supplier ....................................................... 4
Sales by Country of Origin ................................................... 4

Pricing of Beer ................................................................... 5
Gross Profit Margins by Brand .............................................. 5
Table: Consumption of Beer by Category in U.S.A., 2000-2002 ... 6
Table: Shipments by Supplier in the U.S.A., 2001-2002 ............ 6
Table: Total Malt Beverage Shipments in the U.S.A., 1997-2002 ... 7
Table: Share of Total Malt Beverage Shipments in the U.S.A., 1997-2002 ... 7
Table: Percent Change of Total Malt Beverage Shipments in the U.S.A., 1998-2002 .......... 7
Figure:  Share of Total Malt Beverage Shipments in the U.S.A., 1997-2002  8

Distributors in the Three-Tier System .................................... 9

Determinants of Value for Distributors .................................. 9
Proposition: Key Determinants of Distributor Value .................. 10

Value by Brand: Observations from 2002-2003 ........................ 10

Regional Differences .......................................................... 10

Re-Energizing a Brand: The Lowenbrau Case ......................... 11
Conclusions: Brands, Taste, and Country Matters .................. 12

Exhibit 4.2

**APPENDIX** ................................................................. ....... **A-1**

Table A. Consumption of Domestic and Imported
Beer by State, 2002 ................................................................ 1

Table B. Leading Brands of Imported Beer
by Country, 1998-2002 ........................................................ 2

Exhibit 4.2

**Abstract**

**Countries, Tastes, and the Value of Beer Franchises**

*by Patrick L. Anderson*
*Ilhan K. Geckil*
*Anderson Economic Group, LLC*
*East Lansing, Michigan, USA*

The brewing, distribution and sale of beer and ale is one of the world's most ancient, profitable, and durable enterprises. In the United States, this industry is largely separated by post-Prohibition state laws into a "three tier" system that separates the brewer or importer from the distributor and the retailer. The distributors are largely given exclusive market areas and are franchised by the brewer to distribute in those areas to all retailers.

A rigorous approach to business valuation in this industry requires careful market research. Such research provides a fascinating insight into the revealed preferences of U.S. consumers for beer brands. These preferences include their willingness to pay for products of different countries, the drinking preferences of consumers of different ages and backgrounds, and other factors.

Our analysis indicates that consumers in the United States place a very large emphasis on brand and country of origin. An interesting business policy experiment provides us with an opportunity to see how consumers react to a change in the country of origin for one brand of beer, and therefore to gauge whether consumers will pay more for a similarly-branded beer if it is brewed in a different country. In particular, we provide evidence that US consumers today place a tangible value on compliance with an obscure 1516 German law governing the purity of beer.

We demonstrate how those consumer preferences, especially in a franchised industry, translate directly into differing market values for companies that have the rights to supply or distribute different products. We also identify the most important considerations in the proper estimation of lost profits and business value for brewers and distributors in the industry, and compare these considerations with limited observations about actual market values for franchised businesses in this industry.

revised 4 June 2004

**A BRIEF HISTORY OF THE BEER BUSINESS**

The brewing and distributing of beer, or its predecessor alcoholic beverages, is one of the oldest businesses in the human civilization. Beer is part of a family of beverages commonly called "malt beverages," based on its essential ingredients.

Beer is brewed all over the world, all from under names such as ale, stout, porter, pilsner, lager, mead, or other names.

**THE BEER MARKET IN THE UNITED STATES**

The beer market in the United States, like that of other alcoholic beverages, was cataclysmically changed by the Prohibition era of the 1920's. Despite the legal prohibition of most of the consumption of alcoholic beverages, the beer industry never really went away. As immortalized in many classic Hollywood films (such as "The Untouchables" and "The Sting"), the alcoholic beverage industry flourished, although as an illegal industry.

For an illegal product to be the commodity of a flourishing industry requires a great deal of corruption, and the alcoholic beverage industry during Prohibition provided ample resources with which to corrupt many segments of society.

It is interesting that certain aspects of the structure of the (illegal) alcoholic beverage industry during Prohibition are still, more than a half century later, the same fundamentals of the structure of the legal alcoholic beverage industry today.

**THE THREE TIER SYSTEM**

Most of the Hollywood dramatizations of prohibition highlight the role of organized crime in dominating the alcoholic beverage industry. One common abuse was the creation of a "tied-house" tavern, where patrons could receive only those brands of beer that were allowed to be distributed by the controlling syndicate. Through a combination of crime syndicates forced many taverns, speakeasies, and other beer retailers and distributors to use only their favorite brands.

Fundamental micro-economics would indicate that a "tied-house" tavern would provide either inferior, or over priced products, when compared with similar establishments having access to the full range of competitive products and yet another example of how the fundamental insights of economics work in both legal and illegal markets, the tied-house system has now been outlawed in most areas of the United States of America, because of exactly those abuses an economist would have predicted.

Indeed the entire alcoholic beverage industry has now been segmented in the United States into a "three tier" system. The first tier, the brewers or the importers, are confined to producing the product and bringing it to the general market area. The second tier, the distributors or wholesalers then take the product and bring it to the retailer. Only the third tier, the retailer (which would include both taverns that serve the beer on premise, and retailers that sell it in packages for a customer to carry to his or her home or other location) can actually provide the alcoholic beverage to the consumer.

Laws in most states prevent manufacturers from selling to retailers, or from owning an interest in a distributor or retailer. Many of these laws explicitly prohibit a "tied-

Exhibit 4.2

*Countries, Tastes, and the Value of Beer Franchises*                                    *June 25, 2004*

house", and commonly cite the abuses of the Great Depression as a reason for these restrictions on commerce.

**SEGMENTATION OF BEERS BY TYPE**

The preceding discussion described the structure of the industry in the United States. In this section we talk about the types of products.

Beer in the United States is segmented by certain types of beer, in which there are a number of brands. The dominant characteristic segmenting the market is price, although there are certain characteristics of beers in the premium category that vary significantly on non-price characteristcs. These will be of particular interest to us later in this paper.

### TASTE IN THE AMERICAN MARKET

A common European complaint about American beers is that they all "taste the same" or are "watered down." On this particular point, there is scientific evidence to support the European view, or at least a variant of that view. The large portion of the American beer market is devoted to pilsner and lager beers that are significantly "lighter" than the ales favored on the European continent. Furthermore, they do "taste the same", or at least taste quite similarly.

However, a small share of the American market consists of non-pilsner beers, or lagers that taste similar, or are the same product, as beer commonly sold in Europe. These include the following:

- European imports, of which Heineken, Beck's, St. Pauli Girl, Guinness, and Lowenbrau, are examples.
- "Micro-brewery" beers, which are produced at smaller breweries that provide a wide variety of craft brews, including exotic mixtures and special seasonal brews. Micro breweries are discussed further below.
- Imports from other areas of the globe, notably Mexican imports. Many of the Mexican imports (such as Corona or Dos Equis) are lagers similar in taste to "American" beers. Similarly, Canadian beers (such as Labatt or Molson) often taste quite similar to American beers.
- What might be called masquerading micro-brews, which are beers marketed as from a micro-brewery, but in fact established by one of the large American brewers.

As we will discuss later, it is these segments of the market that are growing.

### PRICE IN THE AMERICAN MARKET

At the top of the market, using our price segmentation convention, are the "premium" and "super- premium" beers. These beers do in fact taste differently.

This market has grown considerably since the introduction of what has become known as "micro-breweries" in the United States in the 1980's. Micro-breweries are an interesting phenomenon, in that they are the oldest new thing around. For most of

*Countries, Tastes, and the Value of Beer Franchises*                                                          *June 25, 2004*

recorded human history, all breweries were micro-breweries. Even in the years after Prohibition, local and regional breweries flourished into the 1980's, it was common for regional breweries to have a well established market niche. For example the Stroh's brand, which is brewed in Detroit, was a strong regional brand until its acquisition by a larger national brewery. Coor's, similarly, was a strong Western brand. It successfully expanded nationally. However many other regional local breweries simply passed out of existence.

This domination by a number of national mega-breweries, combined with the fact that, as admitted above, many American beers "taste the same," left the market open for a product distinguished by taste. The product that filled that niche was largely the "micro-brewery." These micro-breweries, which in some cases benefitted from favorable tax treatment in their local jurisdictions, often produced a range of beers that extended beyond the common American lager. These included stouts, ales, wheat beers, and porters. The introduction of these beers into the American market, which to some extent was "starved of variety" produced a rapid growth in the market share of the micro-breweries.

However, the major players were not kept completely napping, and began to produce their own micro-breweries, blurring the distinctions between the major American brands and the upstart micro-breweries. At this time, the total share of the "micro-breweries" still is a vary small fraction of the overall market.

**THE VALUE OF BEER FRANCHISES**

The two tiers of the alcoholic beverage industry of most interest to us are the brewers, and the distributors. The retailers by and large are dependent more on local market conditions, and their own organizational abilities than on any single brand of beer, so we will not discuss that tier in this paper.

*Determinant of Value 1: Volume*

The major determinant of a value of both brewers and distributors is the size of their business. As we will see later in this paper, this is not the only metric, but it is undoubtedly the most important one. Brewers and distributors that move more volume have more valuable businesses.

*Determinant of Value 2: Franchise and Brand*

The second most important characteristic in the value of beer businesses is the franchise that they control. By "franchise," we mean the rights to distribute certain brands of beer in certain areas, or to import or brew those brands for distribution in certain markets.

*Discussion: Limits on Competition*

Unlike in other industries, a beer manufacturer cannot simply decide that it wants to brew a certain type of beer and advertise that beer as identical to the dominant product in that category. We normally encourage that type of behavior in other industries, and try to get those manufacturers to come up with more efficient ways to

Exhibit 4.2

distribute the product, or to lower the price. However, the "three tier" system prevents a manufacturer from coming up with a more efficient method of distributing its products. Furthermore, because most consumers identify the product by brand, it is impossible for Miller to produce a "better Budweiser."

That is not to say that beer manufacturers do not compete on product, they certainly do. However if your major product tastes very similarly to other products, and it is distributed in similar size containers, it is very difficult to sell a better Budweiser.

Perhaps the exception that proves this rule is the creation of the "light" beer segment. Although this tactic had been tried before, it was the Miller Brewing Company's successful advertising campaign for Miller Lite that finally broke the mold. The famous "taste great, less filling" ads, which featured ex-jocks and other characters thought to be role models for a predominately male beer-drinking cohort, the light segment was created. Within in a few short years, all the major brewers had light versions of their beers. The breakthrough was rewarded for Miller, but the competitive advantage could not last.

**BRANDS AND MARKET SHARE**

The competitive nature of the market is best captured by looking at the sales trends for brands in the United States over the last 3-8 years.

*Sales by Price Category*

Table 1, "Consumption of Beer by Category in U.S.A., 2000-2002," on page 6 indicates the sales trends by category. The light and popular categories together account for over 55% of the market, and the similar-tasting premium category adds another 19%. Thus, "American tasting" beers account for about 3/4 of the US Market.

The remainder of the market consists of "super premium" and specialty beers, imported beers, and smaller categories like Malt Liquor and "Ice" beer. Much of the specialty and imported categories are heavier ales and beers that taste differently, though not all.

*Sales by Major Supplier*

Table 2, "Shipments by Supplier in the U.S.A., 2001-2002," on page 6 shows the shipments by supplier. The largest breweries are Anheuser-Busch (brewer of Budweiser, Busch, Michelob) and Miller (brewer of Miller, Miller light), with Coors and Pabst further behind.

*Sales by Country of Origin*

In Table 4, "Share of Total Malt Beverage Shipments in the U.S.A., 1997-2002," on page 7, we calculate the market share of US and non-US brewers in the American market over the past several years. The table, along with Table 3 on page 7 and Table 5 on page 7, reveal the underlying preferences of beer consumers in the US.

These tables indicate the overall market trends in beer:

Exhibit 4.2

*Countries, Tastes, and the Value of Beer Franchises*                    *June 25, 2004*

1. Overall consumption is flat, with little growth.

2. Sales of imported products, along with those of specialty beers, are consistently growing, but still occupy only about 10% of the market.

3. The export sales are vanishing.

**PRICING OF BEER**

The pricing of beer products is strongly affected by the same "three tier" system that governs distribution. The same state laws that set up the system actively discourage price competition, through such mechanisms as requiring posted prices, requiring notice before changing prices, and limiting the ability to give discounts in one area but not another. This is reinforced by restrictions, both legal and contractual, on the ability of distributors in one geographic area to distribute in others.

Thus, the price of beer to the wholesalers (distributors) is largely the same throughout most states. Their "price to retailer" is often also the same throughout most states. Breweries "suggest" a price to retailer, but generally do not have an absolute legal right to enforce this price. Nonetheless, practical pressures, the structure of the industry, and custom encourage uniform pricing to retailers, and therefore a gross profit margin that is very close for most beer brands throughout a state, or even a region of the country.

*Gross Profit Margins by Brand*

With this structure in mind, the gross profit margins of various brands of beer that are "suggested" by the brewer are obviously an important determinant of the value of the businesses that distribute them. Our observations on this point can be summarized as follows:

1. The highest gross profit margins are on imported, super-premium, or specialty beers.

2. Among the high-volume brands, the top American beers (considered "premium," such as Budweiser) have the highest margins. Part of this margin in that large discounts or promotions are not necessary to encourage sales.

3. Next highest margins are among the mid-priced American beers.

4. The lowest margins are among the lower-priced beers, which often compete on price among the segments of the market that are price sensitive.

**Table I. Consumption of Beer by Category in U.S.A., 2000-2002**

(000 2.25-Gallon Cases)

| Category | 2000 Consumption | Share (%) | 2001 Consumption | Share (%) | 2002 Consumption | Share (%) | % Change in Consumption 2000-2001 | 2001-2002 |
|---|---|---|---|---|---|---|---|---|
| **Domestic Beer** | | | | | | | | |
| Super Prem, Micro/Spec & FMBs* | 144,877 | 5.3% | 200,185 | 7.2% | 214,370 | 7.6% | 38.2% | 7.1% |
| Premium | 591,025 | 21.4% | 552,465 | 19.8% | 532,280 | 18.8% | -6.5% | -3.7% |
| Light | 1,218,979 | 44.2% | 1,247,790 | 44.7% | 1,296,950 | 45.9% | 2.4% | 3.9% |
| Popular | 331,550 | 12.0% | 307,770 | 11.0% | 291,160 | 10.3% | -7.2% | -5.4% |
| Malt Liquor | 85,670 | 3.1% | 76,540 | 2.7% | 72,080 | 2.6% | -10.7% | -5.8% |
| Ice | 106,285 | 3.9% | 101,190 | 3.6% | 96,870 | 3.4% | -4.8% | -4.3% |
| **Total Domestic Beer** | **2,478,386** | **89.9%** | **2,485,940** | **89.1%** | **2,503,710** | **88.6%** | **0.3%** | **0.7%** |
| **Total Imported Beer** | **278,284** | **10.1%** | **302,880** | **10.9%** | **321,000** | **11.4%** | **8.8%** | **6.0%** |
| **Total Beer** | **2,756,670** | **100.0%** | **2,788,820** | **100.0%** | **2,824,710** | **100.0%** | **1.2%** | **1.3%** |

**Table II. Shipments by Supplier in U.S.A., 2001-2002**

(000 2.25-Gallon Cases)

| | 2001 Shipments | Share(%) | 2002 Shipments | Share(%) | % Change in Shipments 2001-2002 |
|---|---|---|---|---|---|
| Anheuser-Busch | 1,361,400 | 49.1% | 1,386,000 | 49.1% | 1.8% |
| Miller Brewing | 544,201 | 19.6% | 533,990 | 18.9% | -1.9% |
| Coors Brewing | 312,980 | 11.3% | 312,310 | 11.1% | -0.2% |
| Pabst Brewing | 123,500 | 4.5% | 116,500 | 4.1% | -5.7% |
| All Others | 431,659 | 15.6% | 475,910 | 16.8% | 10.3% |
| **Total Beer** | **2,773,740** | **100.0%** | **2,824,710** | **100.0%** | **1.8%** |

*Source: Adams Beer Handbook, 2003; Analysis: Anderson Economic Group*

*ANDERSON ECONOMIC GROUP*

Exhibit 4.2

**Table III. Total Malt Beverage Shipments in U.S.A., 1997-2002**

(000 2.25-Gallon Cases)

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| Domestic | 2,444,166 | 2,449,302 | 2,436,034 | 2,441,693 | 2,476,867 | 2,487,386 | 2,485,940 | 2,503,710 |
| Imports | 155,996 | 171,839 | 196,150 | 226,059 | 250,328 | 278,284 | 302,880 | 321,000 |
| Exports | 78,532 | 69,468 | 56,900 | 45,300 | 37,000 | 30,740 | 29,820 | 28,370 |
| Non-Alcohol | - | - | 25,000 | 24,500 | 22,500 | 20,900 | 19,870 | 19,000 |
| **Total US Malt Beverages** | **2,678,694** | **2,690,609** | **2,714,084** | **2,737,552** | **2,786,695** | **2,817,310** | **2,838,510** | **2,872,080** |
| Lowenbrau - Labatt | - | - | - | - | 143 | 544 | 449 | 365 |
| Lowenbrau - Miller | n/a | n/a | n/a | n/a | n/a | - | - | - |
| Lowenbrau - Total | n/a | n/a | n/a | n/a | 143 | 544 | 449 | 365 |

Note: Domestic includes Malt-based Coolers.

**Table IV. Share of Total Malt Beverage Shipments in U.S.A., 1997-2002**

(Share of Market)

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|---|
| Domestic | 91.2% | 91.0% | 89.8% | 89.2% | 88.9% | 88.3% | 87.6% | 87.2% |
| Imports | 5.8% | 6.4% | 7.2% | 8.3% | 9.0% | 9.9% | 10.7% | 11.2% |
| Exports | 2.9% | 2.6% | 2.1% | 1.7% | 1.3% | 1.1% | 1.1% | 1.0% |
| Non-Alcohol | 0.0% | 0.0% | 0.9% | 0.9% | 0.8% | 0.7% | 0.7% | 0.7% |
| **Total US Malt Beverages** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| Lowenbrau - Total | n/a | n/a | n/a | n/a | 0.005% | 0.019% | 0.016% | 0.013% |

**Table V. Percent Change of Total Malt Beverage Shipments in U.S.A., 1998-2002**

(Percent Change)

|  | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Domestic | 0.2% | -0.5% | 0.2% | 1.4% | 0.4% | -0.1% | 0.7% |
| Imports | 10.2% | 14.1% | 15.2% | 10.7% | 11.2% | 8.8% | 6.0% |
| Exports | -11.5% | -18.1% | -20.4% | -18.3% | -16.9% | -3.0% | -4.9% |
| Non-Alcohol |  |  | -2.0% | -8.2% | -7.1% | -4.9% | -4.4% |
| **Total US Malt Beverages** | **0.4%** | **0.9%** | **0.9%** | **1.8%** | **1.1%** | **0.8%** | **1.2%** |
| Lowenbrau - Total | n/a | n/a | n/a | n/a | 280.4% | -17.5% | -18.7% |

*Source: Adams Beer Handbook, 2003; Analysis: Anderson Economic Group*

*ANDERSON ECONOMIC GROUP*

*Countries, Tastes, and the Value of Beer Franchises*                                *June 25, 2004*

**FIGURE 1.  Share of Total Malt Beverage Shipments in the U.S.A., 1997-2002**



Exhibit 4.2

*Countries, Tastes, and the Value of Beer Franchises*                              *June 25, 2004*

**DISTRIBUTORS IN THE THREE-TIER SYSTEM**

Under the three-tier system in the United States, beer distributors are typically given the exclusive right to market specific brands of beer in a certain area. They purchase beer from the brewer, and then deliver it to retailers who then pay them an amount that is higher than the cost of the beer at the manufacturer. From this gross margin, they cover their business costs, and frequently earn a profit.

It is in this tier that we find some of the most interesting information about the value of beer brands. Because the distribution rights are normally given exclusively to certain distributors in an area, most distributors have no competition for their specific brands in their own area. Furthermore, through a variety of formal and informal means, distributors of major brands are discouraged from carrying the products of their major competitors. Thus, most areas in the United States have a Miller distributor that handles the Miller portfolio of brands, and a competing Budweiser distributor that handles Anheiser-Busch brands. The other brands with small market share are typically distributed amongst a number of distributors. The brewers for those brands also make some effort to ensure that their distributors are focusing on distributing their products and not their competitors.

The relationship between the brewer and the distributor is not always a happy one. These two entities have like interests, in that they both profit from increased sales of a particular brand. However, like in most franchisor-franchisee relationships, the franchisors interests lie in the enhancement of the quality reputation and increased sales of the product overall, where as the franchisee is interested in maximizing the profits from his or her distribution in a specific area.

As one might expect, the similar interests of the brewer and the franchisor are strong enough to generate many long lasting business relationships, that are profitable for both parties. Indeed, beer distributors for the major brewers are often quite successful enterprises of significant scale in their local communities.

**DETERMINANTS OF VALUE FOR DISTRIBUTORS**

The economics of a distribution business are fairly simple. The main product costs include the costs of goods sold (the beer product from the manufacturer), the cost of operating the trucks to distribute it to the retailers, and the normal operational costs of any business. Because they operate in a specific geographic area, the distance they must cover is an important factor. To the extent the trucks can travel a smaller distance, while distributing a larger amount of product, the business will run much more efficiently.

Given these facts, it is obvious that the most profitable beer distributor businesses would be located in areas where there is substantial volume that can be served in a fairly compact area. Thus, for two distributors in the same metropolitan area, the distributor that has a higher volume will typically carry a larger market value. This improved market value comes from at least two sources; one the higher total amount of gross profit on the product sold; and two the improved efficiency that results from having trucks travel a shorter amount of time in order to distribute an entire load of product.

Exhibit 4.2

*Countries, Tastes, and the Value of Beer Franchises*                                                              *June 25, 2004*

---

### *Proposition: Key Determinants of Distributor Value*

We observed above that brands are a dominant factor in the market, and distribution rights to those brands are given exclusively for geographic areas. We also discussed the economics of the distribution business, noting that geography is a key factor in the cost structure. These observations lead to the following value propositions:

Distributors are worth more, *ceteris paribus*, when they:

1. Have a compact, dense geographic market.
2. Have higher volume brands.
3. Have brands with growing sales.
4. Have high-margin brands.

With these propositions, and the information on sales by segment in "Brands and Market Share" on page 4, and the pricing by brands in "Pricing of Beer" on page 5, we have a reasonably complete structure upon which to predict the relative value of beer distributorships.

**VALUE BY BRAND: OBSERVATIONS FROM 2002-2003**

This predictive structure has been tested with actual market data. The actual market data, however, is not systematic or random, it comes from observations from actual sales where those sales were recorded, and from the professional judgement of those who buy and sell in the market place.

1. At the top of the tiering are the Anheiser-Busch distributors. These distributors, with the highest volume products, and an aggressive brewer with a proven success record, tend to command the highest values in a market place. Anheuser-Busch also has effectively discouraged its distributors from carrying competing products, as it demands "top of mind" focus on selling A-B brands.[1]

2. Next are the distributors for strong second-tier brewers, including Miller, especially if they are in good areas. These distributors, however, are burdened with flat or declining sales for the main Miller and Coors products. Therefore, they often supplement their product line with other products.

3. Next are distributors with particularly hot products, such as certain Mexican imported beers in markets with large Hispanic population, such as Texas and California.

4. Next are distributors with poor market areas, but strong brands, or *vice versa*.

5. Last are distributors with poor market areas, and poor brands.

**REGIONAL DIFFERENCES**

Tastes vary by market, as illustrated in EXHIBIT 1.   "Table A. Consumption of Domestic and Imported Beer by State, 2002," in Appendix A. In some states, consumers have a significantly stronger preference for imported beer.

---

1. A well-known statement by August Busch, chairman of Anheuser-Busch, is the demand for "100% top of mind" focus for its distributors. A-B also has the

---

Exhibit 4.2

*Countries, Tastes, and the Value of Beer Franchises*                                    *June 25, 2004*

Often, these preferences appear to be influenced by the country of origin for immigrant populations within those states. This is apparent in the growing sales of Mexican beers in states with relatively large Mexican immigration.[2] It is somewhat apparent in the strong European import performance in many East Coast states, which have somewhat larger communities of relatively recent immigrants. Elsewhere, it appears to be unrelated to immigrant or ethnic communities.[3] Tastes in some areas, such as resort or high-income areas, appear to have more to do with taste, status, and preferences for a premium or imported product.

**RE-ENERGIZING A BRAND: THE LOWENBRAU CASE**

With this broad-but-brief sweep of the industry in hand, we pose the following business valuation question:

> Can a beer brand be re-established in the consumers' mind as a premium import, and expect to then enjoy the growing sales trend, and higher gross profit margins, that other brands in that segment enjoy?

This business strategy was undertaken by Labatt USA, which purchased the distribution rights to Lowenbrau beer in the United States in 1999. For a decade or so before then, the brand had been brewed in Canada, and had a taste and consumer profile that suggested a Canadian beer. Sales languished.

The original Lowenbrau, however, was a different story. Brewed in Germany for centuries,[4] it was one of the handful of beers that had originally been produced under the 1516 Bavarian beer purity law, known as *Reinheitsgebot*.[5] Beer is a serious matter in Bavaria, which has celebrated *Oktoberfest* as an officially-sanctioned festival for beer brewers and drinkers for nearly 200 years.[6]

Subsequently, Labatt moved the brewing back to Germany, and advertised it as the "original Munich" beer. The company also significantly raised the price, and made changes in the distribution network.

---

2. This is sometimes more generally called the "Hispanic" population, although this term encompasses immigrants and those with ethnic ties to Mexico, Puerto Rico, Cuba, and many other Latin American countries. Although it is often overlooked in social analyses, these groups are not monolithic culturally, politically, or in consumer tastes.

3. Even then, there is often some local or regional connection. For example, the longstanding cultural ties between Canada and northern-tier US states such as Michigan must explain some of the preference for Canadian brands in those states. Indeed, the Detroit Red Wings, one of the sports greatest franchises, is really a Michigan-Ontario club, and wears both the US and Canadian flags on their jerseys, not to mention having Canadian, US, (and Russian) players. Hockey—a sport that flourished across this border for decades—is also a culturally-tying institution that is the occasion for much beer advertising, drinking, and spilling.

4. The company dates the antecedents to Lowenbrau even farther back, an inn known as "Zum Lowen" in 1383.

Exhibit 4.2

This business strategy carries risks and costs. Sharply raising the price of a product, while changing some elements of the distribution system, changing the importer, and changing the product itself cannot help but cause major disruptions. However, the initial sales of Labatt-Lowenbrau were, through available data from 2002, higher than in 2000.

### Conclusions: Brands, Taste, and Country Matters

We do not know yet whether the Lowenbrau experiment will work, but the conclusion we draw from our analysis, and the early results, are the following:

1. Brands are still the most important definer of the beer product for American consumers.

2. If the brand is advertised as a beer that tastes like a european beer, and the taste matches the advertising, consumers will start to treat it like such a product.

3. Country of origin matters. Americans who choose imported beers expect to pay a higher price, and expect to get something for it. Brewing in Germany, especially brewing according to *Reinheitsgebot,* will encourage the knowledgeable segment of the market to buy the brand.

4. Although the import/specialty market is growing, it is still a small segment. Getting into that segment requires paying the dues.

5. The "law" stipulates that only the natural ingredients of barley-malt, hops, yeast and brewing water be used in the brewing process. There is some question about the actual requirements of the law, and strict constructionists claim that no yeast wasn't originally allowed, and so no beer technically meets the original requirements. (See http://www.wohlmut.com/beer/morebeer.html and the references there.) However, especially given the difficulty most people have in interpreting recently-enacted government laws today, this 1516 law is a model of clarity and timelessness. Indeed, this author believes many more Americans can name the four ingredients allowed by *Reinheitsgebot* than can, say, name the deductions from adjusted gross income allowed by the US Internal Revenue Code.

6. According to the history on the festival's web site (http://www.oktoberfest.de), it dates from the wedding of the Bavarian crown prince Ludwig (later known as King Ludwig I) to princess Therese on October 12, 1810, which was followed by a large public horse race "to ensure that the Bavarian folk could also partake in the wedding celebration." This was the birth of the annual festival, which has been held ever since except in years of war, cholera, or severe inflation.

Exhibit 4.2

**Table A. Consumption of Domestic and Imported Beer by State, 2002**

(000 2.25-Gallon Cases)

| State | Domestic | | Imported | | Total Beer |
|---|---|---|---|---|---|
| | Cases | % of Total | Cases | % of Total | Cases |
| Alabama | 40,830 | 96.1% | 1,640 | 3.9% | 42,470 |
| Alaska | 5,320 | 79.8% | 1,350 | 20.2% | 6,670 |
| Arizona | 54,780 | 87.9% | 7,570 | 12.1% | 62,350 |
| Arkansas | 21,210 | 92.2% | 1,800 | 7.8% | 23,010 |
| California | 235,080 | 80.2% | 58,020 | 19.8% | 293,100 |
| Colorado | 43,670 | 88.4% | 5,730 | 11.6% | 49,400 |
| Connecticut | 21,530 | 81.6% | 4,870 | 18.4% | 26,400 |
| Delaware | 7,490 | 82.6% | 1,580 | 17.4% | 9,070 |
| Dist. of Columbia | 5,300 | 82.2% | 1,150 | 17.8% | 6,450 |
| Florida | 155,570 | 86.4% | 24,510 | 13.6% | 180,080 |
| Georgia | 73,070 | 90.8% | 7,430 | 9.2% | 80,500 |
| Hawaii | 11,241 | 80.1% | 2,789 | 19.9% | 14,030 |
| Idaho | 11,430 | 94.0% | 730 | 6.0% | 12,160 |
| Illinois | 108,110 | 85.2% | 18,770 | 14.8% | 126,880 |
| Indiana | 54,340 | 96.9% | 1,760 | 3.1% | 56,100 |
| Iowa | 31,840 | 97.3% | 900 | 2.7% | 32,740 |
| Kansas | 23,440 | 96.5% | 840 | 3.5% | 24,280 |
| Kentucky | 34,390 | 96.8% | 1,140 | 3.2% | 35,530 |
| Louisiana | 50,850 | 95.4% | 2,450 | 4.6% | 53,300 |
| Maine | 12,010 | 92.0% | 1,040 | 8.0% | 13,050 |
| Maryland | 40,690 | 88.6% | 5,230 | 11.4% | 45,920 |
| Massachusetts | 48,260 | 80.9% | 11,400 | 19.1% | 59,660 |
| Michigan | 82,630 | 88.2% | 11,040 | 11.8% | 93,670 |
| Minnesota | 46,090 | 93.3% | 3,310 | 6.7% | 49,400 |
| Mississippi | 30,337 | 95.4% | 1,473 | 4.6% | 31,810 |
| Missouri | 59,100 | 96.3% | 2,300 | 3.7% | 61,400 |
| Montana | 11,187 | 94.6% | 643 | 5.4% | 11,830 |
| Nebraska | 19,480 | 97.4% | 520 | 2.6% | 20,000 |
| Nevada | 24,477 | 81.6% | 5,533 | 18.4% | 30,010 |
| New Hampshire | 15,739 | 88.0% | 2,151 | 12.0% | 17,890 |
| New Jersey | 51,940 | 80.3% | 12,750 | 19.7% | 64,690 |
| New Mexico | 19,960 | 90.4% | 2,130 | 9.6% | 22,090 |
| New York | 113,178 | 76.8% | 34,122 | 23.2% | 147,300 |
| North Carolina | 75,406 | 91.2% | 7,294 | 8.8% | 82,700 |
| North Dakota | 7,637 | 95.5% | 363 | 4.5% | 8,000 |
| Ohio | 114,140 | 93.7% | 7,700 | 6.3% | 121,840 |
| Oklahoma | 29,827 | 94.3% | 1,813 | 5.7% | 31,640 |
| Oregon | 31,846 | 91.9% | 2,804 | 8.1% | 34,650 |
| Pennsylvania | 118,317 | 87.6% | 16,783 | 12.4% | 135,100 |
| Rhode Island | 8,504 | 80.8% | 2,024 | 19.2% | 10,530 |
| South Carolina | 45,121 | 94.0% | 2,879 | 6.0% | 48,000 |
| South Dakota | 8,717 | 95.8% | 383 | 4.2% | 9,100 |
| Tennessee | 51,571 | 95.1% | 2,629 | 4.9% | 54,200 |
| Texas | 235,932 | 93.5% | 16,478 | 6.5% | 252,410 |
| Utah | 12,656 | 95.2% | 644 | 4.8% | 13,300 |
| Vermont | 5,531 | 82.6% | 1,169 | 17.4% | 6,700 |
| Virginia | 58,581 | 85.8% | 9,719 | 14.2% | 68,300 |
| Washington | 47,170 | 90.1% | 5,180 | 9.9% | 52,350 |
| West Virginia | 17,928 | 95.9% | 772 | 4.1% | 18,700 |
| Wisconsin | 64,605 | 95.0% | 3,385 | 5.0% | 67,990 |
| Wyoming | 5,650 | 94.8% | 310 | 5.2% | 5,960 |
| **Total U.S.** | **2,503,710** | **88.6%** | **321,000** | **11.4%** | **2,824,710** |

Note: Highest Import Share states highlighted.

*Source: Adams Handbook, 2003; Analysis: Anderson Economic Group*

*ANDERSON ECONOMIC GROUP*

Exhibit 4.2

**Table B. Leading Brands of Imported Beer by Country, 1998-2002**

(000 2.25-Gallon Cases)

| Brand | Supplier | Origin | 1998 | 1999 | 2000 | 2001 | 2002 | 2001-2002 % Change |
|-------|----------|--------|------|------|------|------|------|--------------------|
| Stella Artois | Labatt USA | Belgium | 15 | 68 | 232 | 490 | 980 | 100.0% |
| Hoegaarden | Labatt USA | Belgium | 20 | 62 | 84 | 142 | 145 | 2.1% |
| Leffe | Labatt USA | Belgium | 15 | 13 | 17 | 33 | 50 | 51.5% |
| Labatt Blue | Labatt USA | Canada | 11,100 | 12,562 | 14,181 | 15,358 | 15,705 | 2.3% |
| Foster's | Miller Brewing | Canada | 7,950 | 8,820 | 8,960 | 9,500 | 9,550 | 0.5% |
| Labatt Blue Light | Labatt USA | Canada | 1,657 | 2,301 | 3,260 | 4,242 | 5,168 | 21.8% |
| Molson Ice | Molson USA | Canada | 9,500 | 7,922 | 6,241 | 5,010 | 4,486 | -10.5% |
| Molson Canadian | Molson USA | Canada | 2,100 | 2,755 | 2,508 | 2,466 | 3,311 | 34.3% |
| Molson Golden | Molson USA | Canada | 5,500 | 4,825 | 3,899 | 3,086 | 2,708 | -12.2% |
| Moosehead | Gambrinus | Canada | 1,535 | 1,637 | 1,787 | 1,924 | 1,730 | -10.1% |
| Labatt Ice | Labatt USA | Canada | 1,770 | 1,394 | 1,366 | 1,155 | 965 | -16.5% |
| Kokanee | Labatt USA | Canada | 365 | 512 | 701 | 821 | 919 | 11.9% |
| Molson Canadian Light | Molson USA | Canada | 95 | 345 | 220 | 344 | 530 | 54.1% |
| Lowenbrau | Labatt USA | Canada | n/a | 143 | 544 | 449 | 365 | -18.7% |
| Carlsberg | Labatt USA | Canada | 188 | 184 | 229 | 322 | 313 | -2.8% |
| Molson Export Ale | Molson USA | Canada | 500 | 345 | 317 | 303 | 248 | -18.2% |
| Labatt Double Blue | Labatt USA | Canada | - - | 117 | 151 | 164 | 170 | 3.7% |
| Labatt Canada Lager | Labatt USA | Canada | 314 | 244 | 181 | 144 | 150 | 4.2% |
| Old Vienna | Molson USA | Canada | 180 | 150 | 138 | 121 | 146 | 20.7% |
| Elephant Malt | Labatt USA | Canada | 91 | 108 | 101 | 98 | 95 | -3.1% |
| Elephant Red | Labatt USA | Canada | 68 | 59 | 46 | 18 | 15 | -16.7% |
| Labatt Family | Labatt USA | Canada | - - | - - | 9 | 10 | 10 | 0.0% |
| Tsingtao | Barton Beers | China | 825 | 805 | 832 | 837 | 827 | -1.2% |
| Pilsner Urquell | Pilsner Urquell USA | Czech Rep | 712 | 732 | 950 | 1,280 | 1,640 | 28.1% |
| Staropramen | United States Beverage | Czech Rep. | 60 | 110 | 110 | 70 | 90 | 28.6% |
| Presidente | Miller Brewing | Dominican Rep | 1,250 | 1,100 | 1,170 | 1,100 | 1,150 | 4.5% |
| Beck's | Beck's North America | Germany | 8,500 | 8,796 | 7,884 | 8,334 | 8,160 | -2.1% |
| St. Pauli Girl | Barton Beers | Germany | 1,800 | 1,750 | 1,988 | 2,105 | 2,268 | 7.7% |
| Warsteiner | Warsteiner Importers Agency | Germany | 1,112 | 1,273 | 1,426 | 1,572 | 1,751 | 11.4% |
| Beck's Dark | Beck's North America | Germany | 1,200 | 1,139 | 968 | 933 | 865 | -7.3% |
| Paulaner Biers | Fischer Beverages International | Germany | 651 | 716 | 728 | 693 | 748 | 7.9% |
| Hacker-Pschorr | Fischer Beverages International | Germany | 475 | 518 | 543 | 564 | 662 | 17.4% |
| Bitburger | Bitburger Brauerei | Germany | 350 | 350 | 365 | 490 | 560 | 14.3% |
| Beck's Light | Beck's North America | Germany | - - | 102 | 546 | 428 | 450 | 5.1% |
| Spaten Premium | Spaten West | Germany | 350 | 360 | 470 | 450 | 440 | -2.2% |
| Beck's Oktoberfest | Beck's North America | Germany | 285 | 285 | 286 | 271 | 275 | 1.5% |
| Franziskaner | Spaten West | Germany | 180 | 190 | 200 | 220 | 230 | 4.5% |
| Spaten Octoberfest | Spaten West | Germany | 185 | 190 | 200 | 230 | 230 | 0.0% |
| St. Pauli Girl Dark | Barton Beers | Germany | 200 | 200 | 215 | 216 | 211 | -2.3% |
| Spaten Optimator | Spaten West | Germany | 120 | 125 | 140 | 140 | 145 | 3.6% |
| Dinkelacker Pilsner | Spaten West | Germany | 80 | 60 | 80 | 90 | 95 | 5.6% |
| Warsteiner Dunkel | Warsteiner Importers Agency | Germany | - - | - - | 52 | 72 | 72 | 0.0% |
| Guinness Stout | Diageo-Guinness USA | Ireland/Canada | 8,731 | 9,579 | 10,035 | 10,684 | 10,715 | 0.3% |
| Harp | Diageo-Guinness USA | Ireland | 2,145 | 2,527 | 2,680 | 2,640 | 2,537 | -3.9% |
| Caffrey's | Labatt USA | Ireland | 35 | 266 | 339 | 309 | 251 | -18.8% |
| Murphy's Stout | Fischer Beverages International | Ireland | 500 | 480 | 460 | 390 | 215 | -44.9% |
| Beamish | Scottish & Newcastle Importers | Ireland | 30 | 80 | 85 | 96 | 105 | 9.4% |
| Murphy's Red Beer | Fischer Beverages International | Ireland | 240 | 250 | 230 | 170 | 100 | -41.2% |

*Source: Adams Handbook, 2003; Analysis: Anderson Economic Group*

Exhibit 4.2

| Brand | Supplier | Origin | 1998 | 1999 | 2000 | 2001 | 2002 | 2001-2002 % Change |
|---|---|---|---|---|---|---|---|---|
| Peroni | Barton Beers | Italy | 225 | 275 | 311 | 354 | 404 | 14.1% |
| Birra Moretti | Fischer Beverages International | Italy | 200 | 160 | 220 | 280 | 310 | 10.7% |
| Red Stripe | Diageo-Guinness USA | Jamaica | 1,004 | 1,129 | 1,220 | 1,294 | 1,445 | 11.7% |
| Sapporo Black Label | Sapporo USA | Japan | 1,430 | 1,580 | 1,780 | 1,840 | 1,910 | 3.8% |
| Asahi Super Dry | Asahi Beer USA | Japan | 758 | 965 | 1,120 | 1,000 | 1,000 | 0.0% |
| Reserve | Sapporo USA | Japan | - - | - - | 25 | 57 | 53 | -7.0% |
| Yebisu | Sapporo USA | Japan | 54 | 55 | 50 | 51 | 52 | 2.0% |
| Corona Extra | Barton/Gambrinus | Mexico | 53,896 | 65,500 | 74,000 | 85,119 | 91,278 | 7.2% |
| Tecate | Labatt USA | Mexico | 7,660 | 8,943 | 11,024 | 12,063 | 13,146 | 9.0% |
| Modelo Especial | Barton/Gambrinus | Mexico | 3,374 | 4,300 | 5,248 | 6,657 | 7,759 | 16.6% |
| Corona Light | Barton/Gambrinus | Mexico | 2,944 | 3,700 | 4,626 | 5,823 | 6,979 | 19.9% |
| Dos Equis | Labatt USA | Mexico | 3,655 | 3,988 | 4,424 | 4,861 | 4,997 | 2.8% |
| Pacifico | Barton/Gambrinus | Mexico | 1,395 | 1,791 | 2,797 | 3,323 | 3,414 | 2.7% |
| Negra Modelo | Barton/Gambrinus | Mexico | 1,138 | 1,325 | 1,467 | 1,802 | 1,964 | 9.0% |
| Sol | Labatt USA | Mexico | 516 | 927 | 1,150 | 1,099 | 1,031 | -6.2% |
| Carta Blanca | Labatt USA | Mexico | 438 | 390 | 444 | 519 | 569 | 9.6% |
| Bohemia | Labatt USA | Mexico | 580 | 527 | 517 | 506 | 511 | 1.0% |
| Heineken | Heineken USA | Netherlands | 43,000 | 47,000 | 54,000 | 56,800 | 62,400 | 9.9% |
| Amstel Light | Heineken USA | Netherlands | 5,200 | 6,000 | 7,100 | 8,500 | 9,770 | 14.9% |
| Grolsch | United States Beverage | Netherlands | 1,600 | 1,800 | 1,850 | 1,700 | 1,800 | 5.9% |
| Bavaria | Bavaria USA, Inc. | Netherlands | 100 | 200 | 250 | 540 | 560 | 3.7% |
| Hollandia | Bavaria USA, Inc. | Netherlands | 80 | 150 | 280 | 300 | 400 | 33.3% |
| Heineken Dark | Heineken USA | Netherlands | 300 | 300 | 300 | 300 | 300 | 0.0% |
| Steinlager | New World Beverage | New Zealand | 800 | 700 | 280 | 278 | 264 | -5.0% |
| OB | Doosan America | South Korea | 175 | 150 | 170 | 160 | 155 | -3.1% |
| Cass | Doosan America | South Korea | - - | - - | - - | 40 | 43 | 7.5% |
| Bass | Diageo-Guinness USA | UK | 6,351 | 6,870 | 7,338 | 7,691 | 7,788 | 1.3% |
| Newcastle Brown Ale | Scottish & Newcastle Importers | UK | 2,696 | 3,089 | 3,475 | 3,953 | 4,391 | 11.1% |
| Boddington's | Labatt USA | UK | 400 | 453 | 475 | 509 | 581 | 14.1% |
| Fuller's | Distinguish Brands | UK | 196 | 183 | 173 | 184 | 196 | 6.5% |
| Tennent's | United States Beverage | UK | 175 | 200 | 120 | 120 | 120 | 0.0% |
| Tetley's English Ale | Barton Beers | UK | - - | 50 | 106 | 112 | 117 | 4.5% |
| John Courage Amber Lager | Scottish & Newcastle Importers | UK | 75 | 85 | 96 | 94 | 95 | 1.1% |
| Double Diamond | Barton Beers | UK | 200 | 125 | 93 | 56 | 31 | -44.6% |
| Theakston Old Peculier | Scottish & Newcastle Importers | UK | n/a | n/a | 24 | 25 | 23 | -8.0% |
| **Total Leading Brands** | | | **213,594** | **239,459** | **264,707** | **288,594** | **308,407** | **6.9%** |
| **Others** | | | **12,465** | **10,869** | **13,577** | **14,286** | **12,593** | **-11.9%** |
| **Total Imported Beer** | | | **226,059** | **250,328** | **278,284** | **302,880** | **321,000** | **6.0%** |

*Source: Adams Handbook, 2003; Analysis: Anderson Economic Group*

## Exhibit 4.3 - Alcohol Beverage Consumption by Major Category, U.S., 2007-2012

*Consumption (Million Gallons)*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | CAGR*<br>2007-2012 |
|---|---|---|---|---|---|---|---|
| Beer | 6,669 | 6,682 | 6,542 | 6,443 | 6,391 | 6,443 | -0.7% |
| Wine | 695 | 701 | 707 | 722 | 744 | 758 | 1.8% |
| Spirits | 432 | 441 | 448 | 457 | 472 | 489 | 2.5% |
| **Total** | **7,796** | **7,824** | **7,697** | **7,622** | **7,607** | **7,690** | **-0.3%** |

*Share of Total*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Average<br>2007-2012 |
|---|---|---|---|---|---|---|---|
| Beer | 85.5% | 85.4% | 85.0% | 84.5% | 84.0% | 83.8% | 84.7% |
| Wine | 8.9% | 9.0% | 9.2% | 9.5% | 9.8% | 9.9% | 9.4% |
| Spirits | 5.5% | 5.6% | 5.8% | 6.0% | 6.2% | 6.4% | 5.9% |

*Retail Sales (Million Dollars)*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | CAGR*<br>2007-2012 |
|---|---|---|---|---|---|---|---|
| Beer | $ 97,940 | $ 99,137 | $ 97,449 | $ 95,850 | $ 95,600 | $ 99,120 | 0.2% |
| Wine | 27,925 | 27,030 | 26,160 | 26,900 | 27,800 | 28,890 | 0.7% |
| Spirits | 61,565 | 62,897 | 64,077 | 65,660 | 68,440 | 72,860 | 3.4% |
| **Total** | **$ 187,430** | **$ 189,064** | **$ 187,686** | **$ 188,410** | **$ 191,840** | **$ 200,870** | **1.4%** |

*Share of Total*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Average<br>2007-2012 |
|---|---|---|---|---|---|---|---|
| Beer | 52.3% | 52.4% | 51.9% | 50.9% | 49.8% | 49.3% | 51.1% |
| Wine | 14.9% | 14.3% | 13.9% | 14.3% | 14.5% | 14.4% | 14.4% |
| Spirits | 32.8% | 33.3% | 34.1% | 34.8% | 35.7% | 36.3% | 34.5% |

Notes:

* CAGR: Compound Annual Growth Rate

*Source: The Beverage Information Group's Beer Handbook 2013*
*Analysis: Anderson Economic Group*

*ANDERSON ECONOMIC GROUP, LLC*

## Exhibit 4.4 - Consumption of Beer by Category, U.S., 2007-2012

*(Thousand 2.25-Gallon Cases)*

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | CAGR 2007-2012 |
|---|---|---|---|---|---|---|---|
| Light | 1,493,500 | 1,524,250 | 1,520,400 | 1,492,000 | 1,452,800 | 1,442,120 | -0.7% |
| Premium & Super Premium | 468,740 | 454,900 | 419,990 | 398,880 | 397,350 | 403,630 | -2.9% |
| Imported | 408,300 | 386,100 | 359,600 | 362,800 | 367,600 | 371,220 | -1.9% |
| Popular | 231,850 | 232,600 | 234,200 | 224,650 | 218,250 | 213,690 | -1.6% |
| Craft | 119,010 | 125,330 | 132,200 | 145,920 | 162,970 | 185,220 | 9.2% |
| Ice | 97,250 | 101,100 | 102,100 | 100,300 | 100,850 | 101,280 | 0.8% |
| FMBs | 66,820 | 67,780 | 64,220 | 68,750 | 71,720 | 80,020 | 3.7% |
| Malt Liquor | 78,600 | 77,850 | 75,000 | 70,250 | 67,850 | 66,550 | -3.3% |
| **Total** | **2,964,070** | **2,969,910** | **2,907,710** | **2,863,550** | **2,839,390** | **2,863,730** | **-0.7%** |

| *Share of Total* | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Average 2007-2012 |
|---|---|---|---|---|---|---|---|
| Light | 50.4% | 51.3% | 52.3% | 52.1% | 51.2% | 50.4% | 51.3% |
| Premium & Super Premium | 15.8% | 15.3% | 14.4% | 13.9% | 14.0% | 14.1% | 14.6% |
| Imported | 13.8% | 13.0% | 12.4% | 12.7% | 12.9% | 13.0% | 13.0% |
| Popular | 7.8% | 7.8% | 8.1% | 7.8% | 7.7% | 7.5% | 7.8% |
| Craft | 4.0% | 4.2% | 4.5% | 5.1% | 5.7% | 6.5% | 5.0% |
| Ice | 3.3% | 3.4% | 3.5% | 3.5% | 3.6% | 3.5% | 3.5% |
| FMBs | 2.3% | 2.3% | 2.2% | 2.4% | 2.5% | 2.8% | 2.4% |
| Malt Liquor | 2.7% | 2.6% | 2.6% | 2.5% | 2.4% | 2.3% | 2.5% |

*Source: The Beverage Information Group's Beer Handbook 2013*
*Analysis: Anderson Economic Group*

*September 11, 2015*

REDACTED

*Exhibit 5. ABI Sales Data*



REDACTED

REDACTED

Exhibit 5

REDACTED

REDACTED

Exhibit 5

REDACTED

REDACTED

REDACTED

REDACTED

Exhibit 5

REDACTED

Exhibit 5

REDACTED

REDACTED

*September 11, 2015*

*Exhibit 6. Extract of Tentative Settlement Agreement*

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is made and entered into by and between the following parties on June ____, 2015: Plaintiffs Francisco Rene Marty, Seth Goldman, and Fernando Marquet, individually and on behalf of the Settlement Class ("Plaintiffs" and/or "Class Representatives"), on the one hand, and Anheuser-Busch Companies, LLC ("Defendant" or "A-B") on the other hand, in the action entitled *Francisco Rene Marty et al. v. Anheuser-Busch Companies, LLC*, Case No. 13-cv-23656 (S.D. Fla.) ("Action").

## I. DEFINITIONS

As used in this Agreement and all related documents, the following terms have the following meanings:

A.      "Beck's Beer" means all bottles or cans of Beck's Pilsner, Beck's Dark, Beck's Light, and/or Beck's Oktoberfest brewed and sold in the United States by A-B.

B.      "Claim" means the claim of a Settlement Class Member submitted as provided in this Agreement.

C.      "Claim Form" means a claim form in substantially the same form and substance as the claim form attached hereto as Exhibit A.

D.      "Claim Period" means the time period in which Class Members may submit a Claim Form for review to the Class Action Settlement Administrator. The Claim Period shall run for one hundred and twenty (120) days from the date that Class Notice is initially disseminated.

E.      "Claims Process" means the process for Settlement Class Members' submission of Claims as described in this Agreement.

F.      "Class Action Settlement Administrator" or "Claims Administrator" means the third-party agent or administrator agreed to by the Parties and appointed by the Court. The Parties agree that Kurtzman Carson Consultants, LLC shall be retained to implement the claims and settlement requirements of this Agreement.

G.      "Class Counsel" means Thomas A. Tucker Ronzetti, Esq., Kozyak, Tropin & Throckmorton, LLP, Lance A. Harke, P.A., Harke Clasby & Bushman LLP, and Robert Rodriguez, Esq., Robert W. Rodriguez, P.A.

H.      "Class Notice" means notice of the proposed settlement to be provided to Settlement Class Members under Section VII of the Agreement substantially in the form attached as Exhibit B.

I.      "Class Period" means May 1, 2011 through the date of Preliminary Approval of Class Settlement.

J.    "Effective Date" means (a) if no objection is raised to the proposed settlement at the Final Approval Hearing, the date on which the final approval order and judgment is entered; or (b) if any objections are raised to the proposed settlement at the Final Approval Hearing and not withdrawn prior to the Final Judgment, the latest of (i) the expiration date of the time for filing or notice of any appeal from the final approval order and judgment, (ii) the date of final affirmance of any appeal of the final approval order and judgment, (iii) the expiration of the time for, or the denial of, a petition for writ of certiorari to review the final approval order and judgment and, if certiorari is granted, the date of final affirmance of the final approval order and judgment following review pursuant to that grant; or (iv) the date of final dismissal of any appeal from the final approval order and judgment or the final dismissal of any proceeding on certiorari to review the final approval order and judgment.

K.    "Final Approval Hearing" means the hearing at or after which the Court will make a final decision whether to approve this Agreement and the settlement set forth herein as fair, reasonable, and adequate and entry by the Court of a final judgment and order thereon.

L.    "Final Judgment" means the judgment the Court enters, finally approving the class settlement.  A proposed Final Judgment is attached hereto as Exhibit C.

M.    "Objection/Exclusion Deadline" means the date twenty-one (21) days prior to the "Final Approval Hearing," defined above.

N.    "Parties" means the Class Representatives and Defendant.

O.    "Preliminary Approval" means the date the Court preliminarily approves the settlement of the Action, including but not limited to, the terms and conditions of this Agreement.

P.    "Publication Notice" means notice of the proposed settlement to be provided to Settlement Class Members under Section VII of the Agreement.  The Publication Notice shall be substantially in the form as the notice attached hereto as Exhibit D.

Q.    "Settlement Class" means: All consumers who purchased Beck's Beer in the United States for personal, family, or household purposes and not for re-sale during the Class Period.  Excluded from the Settlement Class are all persons who validly opt out of the settlement in a timely manner (for purposes of damages claims only); counsel of record (and their respective law firms) for the Parties; Defendant and any of its parents, affiliates, subsidiaries, and all of its respective employees, officers, and directors; and the presiding judge in the Action or judicial officer presiding over the matter, and all of their immediate families and judicial staff.

R.    "Settlement Class Household" means, to the extent family members, or extended family members, living under the same roof and for whom purchases of Beck's Beer were collectively made, those family members shall be treated as one "Settlement Class Household" for purposes of the "Claims Process" described below. For purposes of the "Claims Process," a sole or single "Settlement Class Member" shall be treated as one "Settlement Class Household."

2

S.      "Settlement Class Member" means any member of the Settlement Class.

## II. LITIGATION BACKGROUND

A.      On October 9, 2013, Plaintiff Marty filed the Action seeking damages, injunctive relief and declaratory relief, alleging that Beck's Pilsner had been falsely or misleadingly labeled or marketed. The Action asserted a claim for unjust enrichment on behalf of a nationwide class and a claim for violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* "FDUTPA", on behalf of a Florida subclass.  Plaintiff Marty amended the Complaint on March 31, 2014, adding Plaintiffs Goldman and Marquet, as well as claims under New York General Business Law § 349, California Unfair  Competition Law, Business and Professions Code § 17200, and California Consumer Legal Remedies Act, Civil Code § 1750. The Amended Compliant sought certification of a nationwide unjust enrichment class and three state subclasses for Florida, New York, and California for the consumer protection act claims.

B.      The Parties engaged in substantial discovery.  There were twelve (12) depositions taken of the Parties, non-parties, and expert witnesses. The parties responded to interrogatories and over 28,000 documents were produced.

C.      Defendant A-B moved to dismiss the Amended Complaint in its entirety, which was denied on September 5, 2014.

D.      The Parties engaged experts on marketing practices and damages, who prepared reports and were deposed, and the Parties fully briefed various motions in *limine* directed at the expert witnesses.

E.      The parties fully briefed Plaintiffs' Motion for Class Certification which was argued before Magistrate Judge John O'Sullivan on April 16, 2015.  After the hearing, the Court ordered the parties to conduct a mediation on or before June 18, 2015.

F.      During the pendency of the Action, A-B began the process of changing its packaging to prominently include "Brewed in USA" or "Product of USA" on the front and back of consumer-facing packages of Beck's Beer, as well as to revise the "Product of USA" disclosure on Beck's Beer labels.  These changes have been approved by the Alcohol and Tobacco Tax and Trade Bureau ("TTB").

G.      Defendant expressly denies any liability or wrongdoing of any kind associated with the claims alleged in the Action and believes that its labeling, packaging, and marketing of Beck's Beer have always been truthful and not deceptive. Defendant further contends that, for any purpose other than settlement, this Action is not appropriate for class treatment. Defendant does not admit or concede any actual or potential fault, wrongdoing, or liability concerning or relating to the allegations in the Action.

H.      Class Counsel has conducted a thorough investigation into the facts surrounding the Action. This investigation included but was not limited to: factual research; legal research; and collecting and reviewing of documents and data through discovery and otherwise.

I.     Counsel for the Parties conducted a mediation with Ronald Ravikoff, Esq. on May 26, 2015. Before, during, and after the mediation the parties engaged in a series of discussions regarding a settlement of the Action, including substantial arms-length negotiations. The result was a settlement of the Action in its entirety, culminating with this Agreement.

J.     Based on the above-outlined investigation, the current state of the law, the expense, burden, and time necessary to prosecute the Action through trial and possible appeals, the risks and uncertainty of further prosecution of this Action considering the defenses at issue, the sharply contested legal and factual issues involved, and the relative benefits to be conferred upon Plaintiffs and the Settlement Class Members pursuant to this Agreement, Class Counsel has concluded that a settlement with Defendant on the terms set forth herein is fair, reasonable, adequate, and in the best interests of the Settlement Class in light of all known facts and circumstances. Further, Defendant has agreed to modify the language on the labels of Beck's Beer and to add language to Beck's Beer consumer-facing packaging.

K.     Defendant and Defendant's counsel recognize the expense and length of continued proceedings necessary to continue the Action through trial and through possible appeals. Defendant also recognizes that the expense and time spent pursuing this Action has and will further detract from resources that may be used to run Defendant's business. While Defendant denies any wrongdoing or liability arising out of any of the facts or conduct alleged in the Action and believes that it has valid defenses to Plaintiffs' claims, Defendant has determined that the settlement is fair, adequate, and reasonable.

## III. CERTIFICATION

A.     Certification of Class: For Settlement purposes only, and without any finding or admission of any wrongdoing or fault by Defendant, and solely pursuant to the terms of this Agreement, the Parties consent to and agree to the establishment of a conditional certification of the nationwide Settlement Class, pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(b)(2). Francisco Rene Marty, Seth Goldman, and Fernando Marquet will serve as class representative plaintiffs and Kozyak Tropin & Throckmorton, LLP and Harke Clasby & Bushman, LLP will serve as Co-Lead Class Counsel.

B.     Certification is Conditional: This certification is for settlement purposes only and is conditional on the Court's approval of this Agreement. In the event the Court does not approve all terms of the Agreement, then certification of the Settlement Class should be void and this Agreement and all orders entered in connection therewith, including but not limited to any order conditionally certifying the Settlement Class, shall become null and void and shall be of no further force and effect and shall not be used or referred to for any purposes whatsoever in the Action or in any other case or controversy. And, in such an event, this Agreement and all negotiations and proceedings related thereto shall be deemed to be without prejudice to the rights of any and all parties hereto, who shall be restored to their respective positions as of the date of this Agreement, and Defendant shall not be deemed to have waived any opposition or defenses it

has to any aspect of the claims asserted herein or to whether those claims are amenable to class-based treatment.

## IV. SETTLEMENT CONSIDERATION

In consideration of the mutual covenants and promises set forth herein, and subject to Court approval, the Parties agree as follows:

A.      Injunctive Relief: Defendant stipulates to the following injunctive relief as to Beck's Beer:

1.      For a period of no less than five (5) years, and subject to all necessary regulatory approvals by appropriate governing agencies, inclusion of either the phrase "Brewed in USA" or "Product of USA" on: a) Beck's Beer bottles substantially in the position and form recently approved by the TTB (as reflected in Exhibit E); b) Beck's Beer cans in its present position and form; c) the front and back of all Beck's Beer consumer-facing packages substantially in the position and form reflected in Exhibit F; and d) the "About Beck's" (http://becks.com/#/en/about/becks) page of the Beck's website.  The type face, type size, position, color, and setoff of the disclosures will be agreed by the parties to be sufficient to inform a reasonable consumer of the place where Beck's Beer is brewed while not unduly impairing A-B's marketing.

2.      Plaintiffs agree that Defendant shall be permitted four (4) months from the Effective Date to sell off all of its existing labeling and packaging of Beck's Beer.

B.      Monetary Relief: Defendant shall offer partial refunds to Settlement Class Members for Beck's Beer subject to the following provisions of the Claims Process:

1.      Claims Supported by Proof of Purchase: A Settlement Class Member who has valid proof of purchase of Beck's Beer will be entitled to the following refunds:

a.      Six pack of 12 oz. bottles or cans: $.50 each
b.      Four pack of 16 oz. cans: $.50 each
c.      Twelve pack of 12 oz. bottles or cans: $1.00 each
d.      Fifteen pack of 12 oz. bottles or cans: $1.25 each
e.      Twenty pack of 12 oz. bottles: $1.75
f.      Individual bottle or can: $0.10 each

Such valid proof of purchase shall consist of a sales receipt showing the Beck's Beer purchased and the date of purchase. Such reimbursement, supported by valid proof of purchase for all qualifying purchases, shall be capped at $50.00 per Settlement Class Household.

2.     Claims Not Supported by Proof of Purchase: A Settlement Class Member who does not have valid proof of purchase of Beck's Beer will be entitled to the following refunds without proof:

    a.     Six pack of 12 oz. bottles or cans: $.50 each
    b.     Four pack of 16 oz. cans: $.50 each
    c.     Twelve pack of 12 oz. bottles or cans: $1.00 each
    d.     Fifteen pack of 12 oz. bottles or cans: $1.25 each
    e.     Twenty pack of 12 oz. bottles: $1.75
    f.     Individual bottle or cans: $0.10 each

Such reimbursement, for claims not supported by proof of purchase, shall be capped at $12.00 per Settlement Class Household.

3.     Settlement Class Members may seek reimbursement by completing a Claim Form and timely submitting it to the Class Action Settlement Administrator. A Settlement Class Member may submit the Claim Form electronically via an agreed-upon website (the "Settlement Website") or by mail.

4.     Defendant, through the Class Action Settlement Administrator, shall honor and administer the payment of all eligible Claims submitted either through U.S. mail or online via the Settlement Website within the Claim Period, which begins on the date Class Notice is initially disseminated and expires one hundred and twenty (120) days later.   Defendant shall have no obligation to honor untimely Claims received by the Class Action Settlement Administrator after the Claim Period.

5.     A-B shall fund the total amount to be paid to eligible Settlement Class Members within thirty (30) days after the Class Action Settlement Administrator determines the total amount to be paid to eligible claimants (which the Class Action Settlement Administrator shall do twenty (20) days after the Claims Period ends or twenty (20) days after the Effective date, whichever is later). A-B shall place said fund in an agreed-upon institutional account. The Class Action Settlement Administrator shall then pay all eligible claimants within thirty (30) days after A-B deposits the funds to be paid.

6.     Confirmatory Discovery: The Parties will be entitled to further confirmatory discovery to the extent necessary to support the settlement.

## V. ATTORNEYS FEES AND CLASS REPRESENTATIVE AWARD

Class Counsel agrees that it will apply to the Court for attorneys' fees, costs, and expenses in an amount not to exceed three million five hundred thousand dollars ($3,500,000.00 USD). This is an inclusive amount and specifically includes all costs and fees incurred by Class Counsel and Plaintiffs in connection with the Action thus far, as well as ongoing and future costs

*September 11, 2015*

*Exhibit 7. Potential Recovery: Demographic Method*

**Exhibit 7.1 Potential Recovery: Demographic Method**

| | One-year Period | Four-year Class Period | Memo | Source |
|---|---|---|---|---|
| U.S. Households with Adults | 110,287,184 | 121,315,902 | *Allowance for changing behavior over 4-year period* | U.S. Census Bureau for 2012; AEG allowance |
| Share:  Beer Drinker HHs/All Adult Households | 0.51 | 0.5355 | *Allowance for changing behavior over class period* | Anderson Economic Group assumption; see Exhibit 9. |
| Share:  Beck's Drinkers /Beer Drinkers | 0.025 | 0.02625 | *Includes allowance for regular, occasional, and infrequent users of Beck's* | AEG assumption; note Beck's share of imported beer sales |

| | One-year Period | Four-year Class Period |
|---|---|---|
| **Households Consuming Beck's** | **1,206,698** | **1,705,322** |
| Max Payoff, Assuming No Documentation | | $12.00 |
| **Total Potential Recovery** | **$** | **20,463,870** |

*Sources: US Census; Anderson Economic Group; Sources on Alcholic Beverage Consumption listed in Exhibit 9; Settlement Agreement*

*September 11, 2015*

*Exhibit 8. Potential Recovery: Sales Volume Method*

REDACTED

**Exhibit 8.1 Potential Recovery: Sales Volume Method**



REDACTED

**Exhibit 8.2 Sales Volume Method: Conversion from Barrels to Case Equivalent Volume of Beck's Sold, Settlement Period**

REDACTED

**Exhibit 8.3 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate Amount, 2011**



REDACTED

**Exhibit 8.4 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate Amount, 2012**



REDACTED

**Exhibit 8.5 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate Amount, 2013**



REDACTED

**Exhibit 8.6 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate Amount, 2014**



REDACTED

**Exhibit 8.7 Sales Volume Method: Conversion from Volume of Beck's Sold to Rebate Amount, 2015**



REDACTED

**Exhibit 8.8 Reconciliation of Beck's Sales Volume Information**



Anderson Economic Group, LLC

*September 11, 2015*

*Exhibit 9. Distribution of Alcoholic Beverage Consumption*

**Exhibit 9. Distribution of Alcoholic Beverage Consumption**                    page 1

### Demographics of Alcoholic Beverage Consumption

It appears that frequency of consumption of any alcoholic beer has been steady for several years. Nielsen Scarborough survey data show 99.0 million, 101.1 million, 101.6 million, and 100.7 million consumers age 21 and older have consumed beer during the last 30 days in surveys taken in Autumn and Spring from Autumn 2012 through Autumn 2013.[1] This is broadly consistent with other sources reviewed by Anderson Economic Group experts, including those from the private sector and public sector. Similar fractions of the population (though not identical for the reasons stated below) are used in the analysis shown in Exhibit 7., "Potential Recovery: Demographic Method" in the Appendix of Exhibits.

**Note on Underage Drinking and Consumption Data.** Underage drinking is a well-known phenomenon in the United States, and has been a focus of public health efforts for over a generation. To avoid including underage drinking in our estimates of consumption, we use adult-headed households and adults age 21 and over wherever possible. However, some portion of underage drinking is done on products purchased by adults. Furthermore, some reference sources (such as public health researchers) frequently attempt to measure consumption among residents age 14 and older. Thus, no complete separation in the data is possible.

### Distribution of Beer Consumption

Drinking is not evenly distributed across the population. Furthermore, unlike food, it is not distributed in a pattern with a well-developed central tendency and much lower "tails" of the distribution representing higher and lower consumption. In general, consumption of alcoholic beverages is marked by a significant portion of adults drinking nothing at all; a good portion of moderate, but regular, drinkers; and a small but significant portion of regular and heavy drinkers.

The best available data from multiple sources confirm this observation:

- Carefully-obtained survey data indicate that "on a given day" most Americans drink no alcoholic beverages, but nearly 20% of males and a smaller share of females have had multiple drinks.[2]
- The same survey data show that about 32% of males, and 17% of females, respond positively to survey questions regarding drinking alcoholic beverages during the last 30 days, and 76% and 65% during the last 12 months.[3]
- Data from industry sources, reported in NIAAA Surveillance Report no. 95, provide a corroborating indication. Since alcoholic beverage sales are largely state-regulated, we have fairly accurate knowledge of state-by-state consumption patterns. These patterns consistently reveal that Americans in different states drink different amounts, even when totalled across their entire states. For example, the top decile of alcohol-drinking states (including Wisconsin and Wyoming) had annual per capita consumption of alcohol in the form of beer of 1.5 gallons a

---

1. Nielsen Scarborough Release 1 2014, via Statista.
2. USDA, National Health and Nutrition Examination Study (2010), citing WWEIA/NHANE 24 hour recall survey data from 2003-2006.
3. USDA, National Health and Nutrition Examination Study (2010), citing WWEIA/NHANE 24 hour recall survey data from 2003-2006.

© 2015, Anderson Economic Group, LLC

**Exhibit 9. Distribution of Alcoholic Beverage Consumption**                    page 2

year, and at times even 1.6 gallons a year in the decade of the 2000s.

Meanwhile, the lowest decile (including Oklahoma and West Virginia) had annual per capita consumption of alcohol in the form of beer at 1.2 gallons a year for population 14 and older, in the same decade. This indicates that, even on average across entire states, beer consumption easily varies by 1/3 or more.

Furthermore, these general findings are consistent across time, and across methodologies.

**Large-Consumption Drinking**

A classic study of the distribution of alcoholic beverage consumption in America was *Paying the Tab* by Philip J. Cook (Princeton University Press, 2007). Cook's research suggests that about 30 percent of Americans are tea-totalers; another 30 percent drink about one drink a week; and the top decile of drinkers consume the equivalent of 10 drinks a day.[1]

Data from epidemiological studies focusing on alcohol abuse indicate that 20% and perhaps 30% of Americans appear to routinely exceed drinking limit recommendations.[2] However, "drinking limit recommendations" are not widely known among the population, and different authorities assert different limits. Perhaps the most widely cited "limit" is 5 drinks in a day for males, above which certain public health surveys define as "binge drinking" or "heavy drinking."[3]

**Note on Survey Methodology and Its Limitations.** All these data probably suffer from the phenomenon of under-reporting of alcoholic beverage consumption, and to the typical problems of survey research. Various techniques (such as asking respondents to recall behavior only over a recent, short time period) have been developed to address under-reporting and mis-reporting. Furthermore, in addition to the normal difficulties with survey methodology, asking frequent drinkers to recall the specific number of drinks they consumed (and even the frequency of consuming them over the past 30 days) is certain to create survey research difficulties.[4] Labels such as "heavy drinker" and "binge drinker" should be therefore be considered to be a classification by the researchers, not a self-identification by the consumer.

---

1. Cook's findings were summarized in "Think you drink a lot?" Paul Ingraham, *Washington Post*, September 25, 2014.
2. US HHS, National Epidemiologic Survey on Alcohol and Related Conditions, "Alcohol Alert," no. 70, (2006); citing other sources; note that "drinking limits" are not clearly defined; USDA, citing WWEIA/NHANE 24 hour recall survey data from 2003-2006; indicating that 21% of male adults and 13% of females drank 5 or more drinks on a day when they drank alcoholic beverages; NIAAA, National Survey on Drug Use and Health, 2012 and 2013, indicating that 33% of males, and 17% of females, report "binge alcohol use" (of 5 drinks or more on same occasion within the last 30 days), see Table 2.46B.
   Note that these statistics reflect respondents' recall of behavior over short time periods, which is intended to minimize under-reporting and distortion in their responses. To generalize across a one-year period, one must consider how often "yes" respondents are "no" respondents at other times during the year, and vice versa. In general, the number of people exhibiting behavior over a year-long period will be higher than those that recall it over the most recent 30-day period.

© 2015, Anderson Economic Group, LLC

**Exhibit 9. Distribution of Alcoholic Beverage Consumption**                    page 3

### Share of Beer Consumed by Large-Consumption Drinkers

The data above, from multiple sources and over multiple time periods, strongly support the general observation that consumption of alcoholic beverages follows something like a "Pareto" distribution, meaning a distribution where a small share of the population consumes a large share of the commodity.[1] The phenomenon of a large share of products being purchased by a small share of customers is sometimes popularized as the "80/20 rule" for numerous aspects of commerce. In particular, the term "Pareto rule" or "Pareto Principle" is often applied to the claim that "80% of the business goes to 20% of the customers."[2]

In the case of alcoholic beverages, the survey data (even with its limitations) confirm the disproportionate share consumed by heavy drinkers. However, the exact definition of "heavy" and the precise share consumed by heavy drinkers cannot be neatly extracted from these data.

### Effect of Distribution of Alcoholic Beverage Consumption on Beck's Settlement Recovery

We estimate the maximum potential recovery under the proposed Settlement Agreement using two methods: a demographic method based on the number of adult beer drinkers, and a sales analysis method based on the number of eligible products sold to US consumers.

For the former method, we rely on the assumption of non-documentation of purchases, allowing for a straightforward recovery payment to be estimated on a per-claiming-household basis. This amount is well beneath the $50 cap on payments to a household.

However, for the latter (sales) method, the distribution of consumption strongly affects the maximum recovery, because the $50 cap would limit the payments to the fraction of consumers that regularly consumer Beck's products in significant quantities. It would also limit the recovery for

---

3. National Institute on Alcohol Abuse and Alcoholism (NIAAA) summarizes these on its website page "Drinking Limits Defined" (<http://niaaa.nih.gov/alcohol-health/overview-alcohol-consumption/moderate-binge-drinking>; accessed August and September 2015). It cites NIAAA definitions of binge drinking for men and women in terms of consumption within 2 hours, and National Survey on Drug Use and Health definitions of binge drinking in terms of drinks "on the same occasion" on multiple days.
In addition, the Substance Abuse and Mental Health Services Administration (SAMHSA), which conducts an annual survey of public health, defines "heavy drinking" as 5 drinks or more on the same occasion on each of 5 or more days during the past 30 days.
The NIAAA tables (for results for the National Survey on Drug Use and Health) are explicit in stating that "all heavy alcohol users are also binge alcohol users," which reflects their definitions of the two concepts. However, it is likely that many survey respondents acknowledging regular alcohol consumption in quantities equivalent to 5 drinks or more on a single occasion would resist being characterized as a "binge" drinker. See discussion in text.
4. Because these difficulties are well-known, and are recognized repeatedly in the literature regarding alcoholic beverage consumption, it appears that the careful surveys cited above have been conducted in a manner that attempts to minimize mis-reporting. However, as with all survey data, some mis-reporting occurs.
1. This is named after Italian economist Vilfredo Pareto, who famously observed in his 1896 book Cours d'économie politique that about 20 percent of Italians owned 80 percent of the wealth. However, Vilfredo Pareto's observation—and the statistical Pareto distribution—do not exactly match the 80 and 20 proportions of the popular "rule" associated with it.

© 2015, Anderson Economic Group, LLC

**Exhibit 9. Distribution of Alcoholic Beverage Consumption**                    page 4

those consumers that occasionally consume Beck's products, but do so in large quantities when they do.

**Illustration of Households Reaching the Cap.** We illustrate this below, using the settlement parameters summarized in "Assumptions: Settlement Parameters" on page 12, and assuming that the eligible period for claiming recovery was May 1, 2011 through May 31, 2014, a period of just over four years:[1]

- A person that consumed a six-pack a day, one day each week during the year would almost fall into the "heavy drinking" category established by NIAAA.[2] The sum of 52 six-packs would be equivalent to 26 twelve-packs, each eligible for a $1.00 refund. Therefore, this person would exceed the $50 cap in less than two years.
- An unambiguous heavy drinker, with two six-packs a week, would reach the cap in one year.
- A person that switched from modest drinking (one six pack a month) to heavy drinking (one a week), and then back would also reach the cap during a three-year period, which is less than the duration of the class period.

**Difficulty in Associating Beck's Consumption with "Heavy" Drinking**

The illustrations above suggest that a large share, possibly 30%, of the consumers of alcoholic beverages would "reach the cap" for recovery during a four-year period, if the recovery payments were for all alcoholic beverages. However, only Beck's products (as identified in the Settlement Agreement) are eligible. Thus, we must consider the share of Beck's products consumed in large quantities by "heavy" drinkers.

Note that the sales analysis method starts with eligible sales of Beck's products. Thus, the precise question is the share of these products that were consumed by purchasers in enough quantity to exceed the cap. We assumed that share was smaller than the 30% indicated by general alcoholic beverage consumption, given the following:

- Beck's beer is more expensive than regular products; thus, heavy consumption of this product would be difficult to sustain for many consumers on a financial basis.
- Purchasers wishing to imbibe a large amount of alcohol (such as "binge drinkers") would find it easier, and cheaper, to use other beverages.
- The customer profile for Beck's purchasers is inconsistent with the "heavy drinker" profile.[3]

---

2. For example, one online management guide lists "13 Examples of the Pareto Principle," such as:
   **80% of problems originate with 20% of projects**
   Some projects are far more problematic than others.
   Found at: <http://management.simplicable.com/management/new/examples-of-the-pareto-principle>, accessed September 2015.
   Numerous other examples can be found online by searching for "Pareto Principle."

1. The data for our sales analysis, obtained from ABI, extends over this period. See Exhibit 5., "ABI Sales Data" in the Appendix of Exhibits. The Settlement Agreement sets the recovery period from May 1, 2011 through the date of preliminary approval of the settlement.

2. If it was truly one a week, it would probably technically fall outside the "heavy drinking" definition because it would be fewer than 5 times in the past 30 days. However, given the difficulties noted above under "Note on Survey Methodology and Its Limitations" on page 2 of this exhibit, we assume this is borderline heavy drinking.

© 2015, Anderson Economic Group, LLC

**Exhibit 9. Distribution of Alcoholic Beverage Consumption**                    page 5

Given these considerations, we used a more conservative 20% truncation parameter in our calculation of maximum recovery under the Sales Method. This accounts properly for the fact that some share—although one that cannot be precisely estimated—of the purchases went to those who regularly drank Beck's in "heavy" or near-heavy quantities for a large portion of the eligible period, but does not rely on the incorrect assumption that Beck's consumption parallels that of all alcoholic beverages.

For the calculation under the Sales Method, see Exhibit 8., "Potential Recovery: Sales Volume Method" in the Appendix of Exhibits.

---

3. Customer profile information is apparent from internal ABI research, and from popular advertising. Clearly, Beck's is advertised as a high-end "German quality" product that ABI wishes to orient toward discerning consumers. Indeed, a motivation for ABI's actions, identified in the June Anderson report, was to ensure that consumers continued to associate Beck's with high-quality, relatively high-cost German production even as it switched production to the United States.
This does not, of course, prevent Beck's from being used by heavy drinkers, and Beck's is clearly sold in packaging (such as cases and 12-packs) that would allow heavy drinking by those that choose to do so. However, it suggests that less of Beck's products are used by heavy drinkers than other alcoholic beverage products.

© 2015, Anderson Economic Group, LLC

*September 11, 2015*

*Exhibit 10. List of Data and Documents Reviewed*

*September 10, 2015*

**EXHIBIT 10: LIST OF DATA AND DOCUMENTS REVIEWED**

The following are the sources and references we reviewed, or relied upon, in our report:

### ORDERS, PLEADINGS, DEPOSITIONS, AND AFFIDAVITS

1. Amended Class Action Complaint, Francisco Rene Marty, Seth Goldman and Fernando Marquet v. Anheuser-Busch Companies, LLC, filed 03/31/2014.

2. Deposition Transcript of Justin Ashby from April 16, 2014 and the deposition exhibits, including MACO model (Exhibit 40) and Beck's Family Pricing Recommendation (Exhibit 42).

3. Deposition Transcript of Elizabeth Price Lee from June 10, 2014 and the deposition exhibits, including Project Schnitzel (Exhibit 59) and Final Report: What would be the impact of U.S. brewing for Beck's? (Exhibit 60).

4. Deposition Transcript (Rough) of Francisco Marty from June 12, 2014.

### LAW

5. Various laws and cases cited in text of Exhibit B-1, "Industry Brief: "The Economic Structure of the U.S. Alcoholic Beverage Industry" by Patrick L. Anderson," in Appendix B.

### INDUSTRY DATA AND RESOURCES

6. Interbrew 2002 and 2003 Annual Reports.

7. InBev 2004 and 2006 Annual Reports.

8. AB InBev 2012 Annual Report.

9. Product, history, and related information available on supplier websites, including:
   Beck's website, <www.becks.com>, accessed on May 5, 2014.
   Anheuser-Busch website, <www.anheuser-busch.com>, accessed on May 5, 2014, and also in June 2014.

10. Company, product, and brand information from AB InBev website, <www.ab-inbev.com>, accessed on May 5, 2014

11. Brewery, product and origin information from BreweryDB website, <www.brewerydb.com>, accessed on May 5, 2014 and June 2014.

12. St. Louis Post-Dispatch, <www.stltoday.com>, accessed on May 5, 2014

13. Bremen, Germany website, <http://www.bremen-tourism.de/becks-brewery-tour>, accessed June 2014

14. Beer rating websites, including RateBeer and Beer Advocate, accessed June 2014

15. Websites of online retailers, including Binny's and BevMo!, accessed June 2014

16. USDA, *National Health and Nutrition Examination Study* (2010), citing WWEIA/NHANE 24 hour recall survey data from 2003-2006

17. Cook, Philip J., *Paying the Tab*, Princeton University Press, 2007

18. Ingraham, Paul, "Think you drink a lot?" in *The Washington Post*, September 25, 2014

19. US HHS, *National Epidemiologic Survey on Alchohol and Related Conditions*, "Alcohol Alert," no. 70, 2006

### DEMOGRAPHIC, GEOGRAPHIC, ECONOMIC, AND MARKET DATA

20. Demographic, socio-economic, and geographic data for census tracts in selected states from ESRI. (Some data originates from industry and government sources.)

### FINANCIAL DOCUMENTS & DATA

21. Anheuser-Busch internal documents included as attachments to Deposition of Justin Ashby.

### FINANCE AND ECONOMICS REFERENCES

22. Anderson, Patrick L., *Valuation and Damages for Franchised Businesses*, Anderson Economic Group working paper 2003-12.

23. Anderson, Patrick L., *Business Economics and Finance,* CRC Press, 2004.

24. Anderson, Patrick L., "New Developments in Business Valuation," in *Developments in Litigation Economics,* Elsevier, 2005.

25. Anderson, Patrick L., and Ilhan K. Geckil, "Countries, Tastes, and the Value of Beer Franchises in the United States," June 25, 2004.

26. Gaughan, Patrick A., *Measuring Business Interruption Losses and Other Commercial Damages,* Wiley, 2003.

27. *Business Reference Guide,* various editions published after 2006 by Business Brokerage Press.

### ADDITIONAL SOURCES

28. LaVallee, Robin A., and Yi, Hsiao-ye, "Surveillance Report #95: Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends, 1977-2010," August 2012.

29. Volume data from IRI, obtained from ABI.

30. Industry standards for conversion of volume units, from AEG professional knowledge.

31. Census Bureau data on adult heads of households.

32. Nielson Scarborough Release 1 2014, via Statista